UNITED STATES of America, Appellant,

v.

Karen R. YOUNG and Nathaniel J. Pugh, Appellees.

No. 78–1678.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1978.

Decided April 12, 1979.

---

William J. Birney, Asst. U. S. Atty., Washington D. C. with whom Earl J. Silbert, U. S. Atty., John A. Terry, Michael W. Farrell and Thomas J. Tourish, Jr., Asst. U. S. Attys., Washington, D. C., were on brief, for appellant.

William J. Garber, Washington, D. C. (appointed by this Court), for appellee Young. Also argued for appellee Pugh.

Charles F. Barker, Washington, D. C. (appointed by this Court) was on brief, for appellee Pugh.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by ROBB, Circuit Judge.

Concurring Opinion filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.

ROBB, Circuit Judge:

The United States appeals from an order of the District Court suppressing evidence. 18 U.S.C. § 3731. We reverse.

The defendants Young and Pugh were indicted in two counts. The first count charged that on March 1, 1978 they had in their possession a check payable to Gertrude Jenkins which they knew had been stolen from the mail. 18 U.S.C. § 1708. The second count alleged that on March 1, 1978 they falsely personated Gertrude Jenkins in an endeavor to receive money which she was entitled to receive. 18 U.S.C. § 914.

Before trial both defendants filed motions to suppress evidence. Young moved to suppress the evidence seized as an incident to her arrest, consisting of a Treasury check payable to Gertrude Jenkins and a false identification card in the name of Gertrude Jenkins. She averred that there was no probable cause for her arrest. She also

moved to suppress her written confession upon the ground that it was the product of the unlawful arrest, was involuntary and was made without an intelligent and knowing waiver of her rights. Pugh moved for suppression of his confession on the ground that it was the fruit of an illegal arrest. He did not contend that his confession was involuntary.

After a two-day hearing the district judge in an oral ruling denied the motion to suppress. He held that probable cause for the arrest of Young was established by information received from a reliable informant, together with "the sequence of events" leading up to the arrest, "the mosaic that was being developed." (Tr. 247, 248) He also held that Young's confession was voluntary and made with a full understanding of her rights. Subsequently however the district judge announced that he had reconsidered his ruling; and in a memorandum opinion and order he then held that there was no probable cause for the arrest of the defendants and that their confessions as well as the stolen Treasury check and false identification card seized from Young must be suppressed. We think the District Court's original conclusions were correct.

■■■ The definition of probable cause is established and familiar: it exists when the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed. As the words "probable cause" imply the concept deals with probabilities, not with certainty; probable cause may exist although the evidence before the arresting officer is not sufficient to establish guilt. *Brinegar v. United States*, 338 U.S. 160, 172–73, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Davis*, 147 U.S.App.D.C. 400, 458 F.2d 819 (1972). As we have said in other cases, whether probable cause exists depends on the facts and circumstances of the particular case so

that the decision in one case seldom furnishes a pat answer in another. A principle to be applied generally however is that in judging the reasonableness of the actions of the arresting officer the circumstances before him are not to be dissected and viewed singly; rather they must be considered as a whole. As the district judge here aptly put it in his oral opinion, the facts must be appraised as a "mosaic". So considered they are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training. *See United States v. Davis*, 147 U.S.App.D.C. 400, 458 F.2d 819 (1972); *United States v. Hall*, 187 U.S.App.D.C. 215, 535 F.2d 857 (1976); *United States v. Wylie*, 186 U.S.App.D.C. 231, 569 F.2d 62 (1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978).

We turn now to a consideration of the facts and circumstances known to the officers when they arrested the defendants Young and Pugh.

At the hearing on the motion to suppress, the evidence disclosed that about 5 o'clock on the afternoon of March 1, 1978 an informant telephoned the Washington field office of the Secret Service from the Creative Photography Shop at 1749 Pennsylvania Avenue, N.W., in Washington, D.C. Although the informant was not identified at the hearing it is plain that he was either the proprietor or an employee of the photography shop. He reported that a black female, later identified as Karen Young, was then purchasing a photographic identification card in the name of Gertrude Jenkins, 3516–10th Street, N.W. He described Young as a person approximately twenty-five years old, five feet four inches tall, weighing 125 pounds. He said a stolen United States Treasury check might be involved.

The informant had been providing information to the Secret Service for about five years. On many prior occasions he had given information which had proved to be correct and which had led to arrests and convictions. Secret Service agents Flemister and Adams testified that they had par-

ticipated in several investigations begun on the basis of information from the informant. Agent Flemister testified that she had participated in approximately fifty such investigations and that about twenty arrests were made as a result of the informant's reports. Agent Adams testified that he had taken part in about twelve such investigations and that about one-half of these resulted in arrests and convictions.

The agents knew that Treasury checks were normally delivered in the first three days of the month and that false identification cards were frequently used to cash stolen Treasury checks. As Agent Adams, an agent of wide experience, testified, "[t]he modus operandi is about the same anywhere in the country." (Tr. 215)

The information given by the informant was transmitted to agents who immediately went to the vicinity of the Creative Photography Shop, located only one block from the Washington field office of the Secret Service. Among these agents were Flemister and Adams and Agents West and Rasor. They set up a surveillance of the shop, Flemister and West being seated in an automobile parked on Pennsylvania Avenue directly across from the shop.

While the agents maintained their surveillance at the photographic shop Secret Service Agent Whicher went to the home of Gertrude Jenkins at 3516–10th Street, N.W. Mrs. Jenkins was not at home but a neighbor told Agent Whicher that Gertrude Jenkins was a 75-year old black woman with gray hair. The neighbor also informed Agent Whicher that earlier in the day her husband had seen an unknown black male walking away from Mrs. Jenkins' porch with a brown envelope that. looked like the kind of envelope that would contain a check. The neighbor told Agent Whicher that her husband had seen the man from his house across the street but that when he went downstairs to get a better look the man was gone. The man was described as a black male approximately six feet tall, weighing 200 pounds, wearing a knit hat, brown pants and a coat. This information was transmitted by radio to the agents on the scene at the photography shop. Agent Whicher testified that he did not recall whether the neighbor had mentioned a mail box, but Agent Flemister testified that the radio transmission relayed by the dispatcher at the field office stated that the unknown man had been near the mail box on Mrs. Jenkins' porch.

The agents watching the photography shop saw the defendant Pugh standing on the sidewalk outside the shop. With him was a second man—a heavy-set black male wearing a knit hat and brown pants. The agents judged that he weighed between 200 and 220 pounds and was between 5'10" and 6' tall; and they concluded that he matched the description of the unknown man seen earlier in the day walking away from Mrs. Jenkins' porch with a brown envelope. Pugh and the second man were "looking around" and appeared to the agents to be acting as lookouts. Presently they crossed Pennsylvania Avenue and stood on the sidewalk, looking across the street in the direction of the photography shop. In a few minutes the defendant Young came out of the shop, crossed Pennsylvania Avenue and joined Pugh and the second man. Followed by the agents the three then walked several blocks to 14th Street where they boarded a bus and went to 14th and Clifton Streets, N.W., where they got off the bus. After a short talk with the two men Young went across the street to a liquor store. The two men waited on the opposite side of the street.

Agent Flemister followed Young into the liquor store where Young joined a line of people waiting to cash checks. Flemister stood in the line, separated from Young by one person. In her hand Young had a brown envelope with a cellophane face and Flemister "could see the original color of the check inside". Young frequently turned her head to look out the front window of the store as if looking for somebody. When she reached the counter Young took the check out of the envelope and put it down on the counter. Agent Flemister recognized the check as a United States Treasury check. The clerk picked up the check

and handed it back to Young saying "I can't cash this" or "I can't take this". Young then stepped out of the line and Flemister joined her and placed her under arrest. At the time of the arrest Agent Flemister took from Young a photographic identification card in the name of Gertrude Jenkins and a Treasury check payable to Gertrude Jenkins.

While Young and Agent Flemister were in the liquor store Agents Adams and Resor, in their car parked close by, kept Pugh and the second man under observation. Based on their "past investigative experience" the agents believed that the two men were "in a lookout posture". Specifically, they "were looking around and observing" and "appeared to be looking into the liquor store." The second man was holding up a newspaper as if reading it, but was looking over the newspaper towards the liquor store. After some ten minutes had passed the agents heard on their car radio that Young had attempted to negotiate the check and they then got out of their car and identified themselves to Pugh and the second man as Secret Service Agents. Pugh and the other man immediately fled. Adams was able to apprehend Pugh but the other man escaped.

After she was arrested Young was taken to the agents' car at the scene, where Agent Flemister advised her of her rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Young was taken to the Washington field office of the Secret Service where she was again advised of her rights. On both occasions she indicated that she understood. She agreed to answer questions but refused to sign a printed warning and "waiver of rights" form. However she freely answered questions and subsequently wrote out and signed a confession. At no time did she indicate that she was unwilling to answer

questions or that she wanted to talk with a lawyer. Pugh was also advised of his rights and later made a written statement concerning his involvement in the case.

On this appeal the appellees contend that their arrests were unlawful, because made without probable cause; accordingly, they say the evidence seized from Young must be suppressed. They argue also that their post-arrest statements must be suppressed as "the fruit of the poisonous tree".[1] We think their arguments must be rejected.

■ In his memorandum opinion the district judge concluded that the arresting officers acted on mere suspicion as distinguished from probable cause. In reaching this decision he dissected the information in the possession of the arresting officers, considering each item individually, and concluding that it did not generate more than a mere suspicion.[2] As we have said however all the facts and circumstances must be considered as a whole, and when so viewed we think they plainly amounted to probable cause. The actions of the defendants conformed to a pattern familiar to the officers, a modus operandi generally used by those seeking to cash stolen Treasury checks. Those activities began at 5 o'clock in the afternoon and continued without a break until the defendants were arrested at 6 o'clock. As the district judge correctly stated in his oral ruling, they constituted a "sequence of events" which justified a reasonable belief that the defendants were jointly engaged in a criminal enterprise directed to the cashing of a stolen check. The officers would have been naive indeed had they entertained any other belief. Accordingly we hold that there was probable cause for the arrest of both defendants. The motions to suppress should have been denied.

---

1. The appellees do not contend that their statements were involuntary under the rule of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Having read the record we think the statements were clearly voluntary.

2. The district judge in his opinion referred to *United States v. Johnson,* 483 F.2d 444 (5th Cir.

1973), and *United States v. McMillian,* 438 F.2d 980 (4th Cir. 1971). In each of these cases the court considered the sufficiency of evidence to support a conviction. However evidence may establish probable cause although it is not sufficient to establish guilt.

The judgment of the District Court is *Reversed.*

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring:

Police officers have probable cause for a warrantless arrest, the Supreme Court instructs, "where 'the facts and circumstances within their . . . knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."[1] This definition refines the elements mandated by the Fourth Amendment,[2] as it has been judicially understood for at least the last half-century.[3] There must be "more than bare suspicion,"[4] yet there may be less than proof beyond a reasonable doubt;[5] "'[t]he substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.'"[6] Moreover, "[p]robable cause is a plastic concept whose existence depends on the facts and circumstances of the particular case."[7] Since police officers, not judges, make the initial probable cause determinations when no warrant is involved, "[t]he standard is that of 'a reasonable, cautious and prudent peace officer' and must be judged in the light of his experience and training."[8] Thus "[a] finding of probable cause depends

1. *Brinegar v. United States*, 338 U.S. 160, 175 176, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949), quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925). Accord, *Gerstein v. Pugh*, 420 U.S. 103, 111–112, 95 S.Ct. 854, 861 862, 43 L.Ed.2d 54, 63–64 (1975); *United States v. Carter*, 162 U.S.App.D.C. 132, 134, 498 F.2d 83, 85 (1974); *United States v. Davis*, 147 U.S.App.D.C. 400, 402, 458 F.2d 819, 821 (1972); *Bailey v. United States*, 128 U.S.App.D.C. 354, 358, 389 F.2d 305, 309 (1967).

2. See U.S.Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 898–899 (1968); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1964); *Henry v. United States*, 361 U.S. 98, 100 102, 80 S.Ct. 168, 170–171, 4 L.Ed.2d 134, 137 138 (1959).

3. We have come a long way from Chief Justice Marshall's formulation in 1813: "[T]he term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation; and, in all cases of seizure, has a fixed and well known meaning. It imports a seizure made under circumstances which warrant suspicion." *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348, 3 L.Ed. 364, 367 (1813). See note 4 *infra* and accompanying text.

4. *Brinegar v. United States*, *supra* note 1, 338 U.S. at 175, 69 S.Ct. at 1310, 93 L.Ed. at 1890. Accord, *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441, 450 (1963); *Henry v. United States*, *supra* note 2, 361 U.S. at 101, 80 S.Ct. at 170 171, 4 L.Ed.2d at 137; *United States v. Branch*, 178 U.S.App. D.C. 99, 107, 545 F.2d 177, 185 (1976); *Von Sleichter v. United States*, 153 U.S.App.D.C. 169, 173, 472 F.2d 1244, 1248, *cert. denied*, 409 U.S. 1063, 93 S.Ct. 555, 34 L.Ed.2d 517 (1972).

5. *Adams v. Williams*, 407 U.S. 143, 149, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612, 618 (1972); *Brinegar v. United States*, *supra* note 1, 338 U.S. at 174 175, 69 S.Ct. at 1310, 93 L.Ed. at 1889 1890; *Von Sleichter v. United States*, *supra* note 4, 153 U.S.App.D.C. at 174, 472 F.2d at 1249; *United States v. Moore*, 148 U.S.App. D.C. 336, 338, 459 F.2d 1360, 1362 (1972); *Lewis v. United States*, 135 U.S.App.D.C. 187, 190, 417 F.2d 755, 758, *cert. denied*, 397 U.S. 1058, 90 S.Ct. 1404, 25 L.Ed.2d 676 (1969); *Pendergrast v. United States*, 135 U.S.App.D.C. 20, 28, 416 F.2d 776, 784, *cert. denied*, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969).

6. *Brinegar v. United States*, *supra* note 1, 338 U.S. at 175, 69 S.Ct. at 1310, 93 L.Ed. at 180, quoting *McCarthy v. DeArmit*, 99 Pa. 63, 69 (1881), quoted with approval in *Carroll v. United States*, *supra* note 1, 267 U.S. at 161, 45 S.Ct. at 288, 69 L.Ed. at 555. Accord, *Pendergrast v. United States*, *supra* note 5, 135 U.S. App.D.C. at 28, 416 F.2d at 784; *Bailey v. United States*, *supra* note 1, 128 U.S.App.D.C. at 357, 389 F.2d at 308.

7. *Bailey v. United States*, *supra* note 1, 128 U.S.App.D.C. at 357, 389 F.2d at 308. Accord, *Adams v. Williams*, *supra* note 5, 407 U.S. at 149, 92 S.Ct. at 1924, 32 L.Ed.2d at 618: *Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 56–57, 478 F.2d 938, 966–967, *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973); *United States v. Johnson*, 148 U.S.App.D.C. 205, 207, 459 F.2d 1229, 1231 (1972); *Dixon v. United States*, 111 U.S.App.D.C. 305, 306–307, 296 F.2d 427, 428-429 (1961).

8. *Bailey v. United States*, *supra* note 1, 128 U.S.App.D.C. at 358, 389 F.2d at 309, quoting *Bell v. United States*, 102 U.S.App.D.C. 383, 387, 254 F.2d 82, 86, *cert. denied*, 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113 (1958). Accord, *Coleman v. United States*, 137 U.S.App.D.C. 48, 53, 420 F.2d 616, 621 (1969); *Davis v. United*

on the 'practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' "[9]

Not for a moment have I doubted the presence of probable cause to arrest Karen Young.[10] The court's opinion today recounts the circumstances overtly incriminating her, and no more on that point need be said. The implications for Nathaniel Pugh are not nearly so evident, however, and certainly the outcome for the one does not follow automatically for the other. After pondering what for me has been a close question, I join my colleagues in concluding that Pugh's arrest survived the strictures of probable cause,[11] and resultantly that his ensuing confession was not suppressible.[12] In order to clarify the basis of my concurrence in that regard, I set forth my views separately.

I

Pugh first came under surveillance outside the photography shop wherein Young was obtaining a false identification card. He was standing beside a heavy-set male, who matched the description of the person who presumably appropriated Gertrude Jenkins' check.[13] Shortly thereafter, the two men crossed to the other side of the street, and Pugh walked up and down while gazing across at the shop.[14] He was later joined by Young and the heavy-set man, and the three traveled together, first on foot and then by bus, to the liquor store at which Young attempted to cash the stolen check.[15]

After debarking from the bus the three conferred briefly.[16] Young entered the store, and Pugh and the other man remained across the street.[17] As Pugh stood there he watched the store continually;[18] his companion, holding a newspaper, peered over it in the same direction.[19] Eventually, Secret Service agents posted nearby were ordered by radio to arrest the two men.[20] The agents approached and announced their official character, whereupon Pugh and his companion instantly fled.[21] After a short chase, Pugh was apprehended and placed under arrest,[22] and the confession followed shortly. The unidentified man made good his escape.[23]

That was the sum total of the information on Pugh available to the agents when they undertook to take him into custody. Pugh had been seen in the company of a person suspected of stealing the check, and of another person suspected of endeavoring to cash it. The three were obviously acquaintances of some sort; they conversed together, they journeyed together from the

States, 133 U.S.App.D.C. 172, 173 174, 409 F.2d 458, 459 460, cert. denied, 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969); Jackson v. United States, 112 U.S.App.D.C. 260, 262, 302 F.2d 194, 196 (1962).

9. Brinegar v. United States, supra note 1, 338 U.S. at 175, 68 S.Ct. at 1310, 93 L.Ed. at 1890. Accord, Pendergrast v. United States, supra note 5, 135 U.S.App.D.C. at 28, 416 F.2d at 784; Bailey v. United States, supra note 1, 128 U.S. App.D.C. at 358, 389 F.2d at 309.

10. I speak only to the question of probable cause, of course, and intimate no view on innocence or guilt.

11. See note 10 supra.

12. Brown v. Illinois, 422 U.S. 590, 604 605, 95 S.Ct. 2254, 2262 2263, 45 L.Ed.2d 416, 427 428 (1975); Wong Sun v. United States, supra note 4, 371 U.S. at 485 486, 83 S.Ct. at 416 417, 9 L.Ed.2d at 454; Gatlin v. United States, 117 U.S.App.D.C. 123, 128-129, 326 F.2d 666, 671 672 (1963). Cf. Alderman v. United States, 394

U.S. 165, 171, 89 S.Ct. 961, 965, 22 L.Ed.2d 176, 185 (1969).

13. Trial Transcript (Tr.) 168 169.

14. Tr. 34 35, 169.

15. Tr. 36, 173 174, 179.

16. Tr. 185, 209.

17. Tr. 48, 179.

18. Tr. 180, 186.

19. Tr. 183 184, 186.

20. Tr. 186, 210.

21. Tr. 187.

22. Id.

23. Tr. 34 35, 48, 169, 179.

photography shop to the liquor store, and from aught that appears were prepared to continue their association, for whatever purpose it served. Along with the heavy-set man, Pugh remained close by the photography shop while Young's false identification card was procured, and by the liquor store while the check-cashing effort was under way. In each instance, as he waited he watched the establishment into which Young had entered—sometimes standing, sometimes walking back and forth, but always watching.[24]

## II

Had the agents effected Pugh's arrest when they initially confronted him—and before he ran—it seems rather clear that without more his apprehension could not have passed constitutional muster. Association with criminal suspects and presence at the scene of a crime are circumstances which courts have repeatedly held insufficient to establish probable cause, absent something else to indicate participation or guilty knowledge by the arrestee.[25] Faced with nearly identical facts, the Eighth Circuit recently held that an arrest was invalid where the arrestee drove an acquaintance to a liquor store and waited outside while his companion entered and attempted to pass a counterfeit bill.[26] In Pugh's case, however, an additional factor came into play—when the agents approached and identified themselves, Pugh bolted away, forestalling any investigative detention or arrest for the time being.[27] The question,

---

**24.** At the suppression hearing, the testifying agent opined that this indicated that Pugh was a lookout. Tr. 168–170, 180, 186. I would agree that Pugh's conduct as described was ambiguous—on the one hand arguably consistent with the theory that he was innocently waiting while a companion completed an errand but on the other hand susceptible to the interpretation that he had reason to be apprehensive of his own well being. See text *infra* at note 31. I am unable to accept, however, the agent's conclusion with respect to Pugh's so-called "lookout" role. At both locations, Pugh remained on the opposite side of the street from where Young's transactions occurred, Tr. 34, 180, from which position it would have been impossible to perform what would seem to be a lookout's primary function—to warn his principal of impending danger. Furthermore, given the fact that the trio was traveling on foot and by public transportation, Tr. 36, 173 174, 179, there was little that Pugh could accomplish even if he realized that he and his cohorts were under suspicion.

**25.** See *United States v. Di Re*, 332 U.S. 581, 593–594, 68 S.Ct. 222, 228, 92 L.Ed. 210, 219 220 (1948) (individual's presence in automobile in which counterfeit ration coupons were passed from his companion to an informant is not sufficient without more to support an inference of criminal activity on his part, particularly "when the meeting is . . . in broad daylight, in plain sight of passers-by, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal"); *United States v. Chadwick*, 532 F.2d 773, 784 (1st Cir. 1976), aff'd, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (fact that individual picked up drug smugglers and their illegally imported narcotics at airport is insufficient to establish probable cause for his arrest); *United States v. Seay*, 432 F.2d 395, 400 402 (5th Cir. 1970) (fact that individual was present in automobile outside store while companion entered store and attempted to pass counterfeit bill, and fact that the individual subsequently accompanied companion into a restaurant, is insufficient to establish probable cause); *United States v. Barber*, 557 F.2d 628, 630 -633 (8th Cir. 1977) (fact that individual drove acquaintance to liquor store and waited outside in car while companion entered store and attempted to pass counterfeit bill insufficient to establish probable cause for his arrest).

**26.** *United States v. Barber, supra* note 25, 557 F.2d at 630 633. See also *United States v. Linnear*, 464 F.2d 355, 356 (9th Cir. 1972) (no probable cause to arrest individuals who waited outside in automobile while acquaintance engaged in cocaine transaction inside building). In a readily distinguishable situation, the Second Circuit found probable cause to arrest two individuals who accompanied a suspect both before and after he attempted to pass a counterfeit note, where the two arrestees had minor arrest records and were observed counting and exchanging money with the suspect. *United States v. Olsen*, 453 F.2d 612, 614–616 (2d Cir. 1972).

**27.** Pugh's presence near the scene of the crime and his prior association with the other two seemingly would have warranted a reasonable belief that criminal activity was afoot and a well-founded suspicion that Pugh possibly was involved in it. That much could have justified Pugh's temporary detention on the spot for questioning. E. g., *Terry v. Ohio, supra* note 2. The record tends, however, to negate any purpose the oncoming agents had in mind other than a full-fledged arrest.

then, is whether Pugh's hasty exit from the vicinity of the liquor store so colored the observed events preceding it as to give rise to probable cause from the whole.

Flight, standing alone, is ambiguous, for "it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.' "[28] Mere flight, then, does not provide a basis for a warrantless arrest.[29] This court has suggested, beyond that, that association with a supposed criminal does not necessarily blossom into probable cause simply because of subsequent flight from oncoming police.[30]

Pugh's conduct, however, involved significantly more. He had consorted not with one highly questionable companion but two. He had frequented with them not through one devious affair but two. This camaraderie had extended over an appreciable period, and had moved from one geographic

point to the other as the exigencies of consummating an ostensible check-cashing scheme seemingly required. Another indication of a confederation possibly bent on crime was the apparent wariness of the two men whenever Young entered a business establishment.[31] It was against this backdrop that the arresting agents could view Pugh's flight in assessing the situation for probable cause.

## III

In my view, no one of the several circumstances known to the agents could singly establish probable cause vis-a-vis Pugh. Taken together, however, I believe they supplied constitutionally adequate ground for his arrest. There came a time at which several loosely allied ingredients coalesced into a positive indication of criminality, and Pugh's flight was the catalyst in the process. Rapid departure from the site of a crime after close association with its perpetrators during more than one phase of its execution tends appreciably to connote guilty knowledge through its reduction of the probability that the eloper was merely

**28.** See *Wong Sun v. United States, supra* note 4, 371 U.S. at 482–483 & n.10, 83 S.Ct. at 407 & n.10, 9 L.Ed.2d at 441 & n.10, quoting *Alberty v. United States*, 162 U.S. 499, 511, 16 S.Ct. 864, 868, 40 L.Ed. 1051, 1056 (1896).

**29.** *Wong Sun v. United States, supra* note 4, 371 U.S. at 482–483 & n.10, 83 S.Ct. at 407 & n.10, 9 L.Ed.2d at 441 & n.10, quoted in text *supra* at note 28; *United States v. Davis*, 147 U.S.App.D.C. 400, 403, 458 F.2d 819, 822 (1972) (flight, standing alone, is not a dependable indicium of guilt); *Hinton v. United States*, 137 U.S.App.D.C. 388, 391, 424 F.2d 876, 879 (1969) (flight has not been considered a "reliable indicator of guilt without other circumstances to make its import less ambiguous").

**30.** *Hinton v. United States, supra* note 29, 137 U.S.App.D.C. at 391, 424 F.2d at 879 ("[w]e would hesitate to hold that the facts that appellant was found with [a known narcotics user] and bolted when [his companion] was arrested and searched added up to probable cause"). See *United States v. Embry*, 546 F.2d 552, 556 (3d Cir. 1976), *cert. denied*, 430 U.S. 948, 97 S.Ct. 1587, 51 L.Ed.2d 797 (1977) (without more, individual's flight triggered by street frisk of companion "might not have afforded

sufficient probable cause to justify his apprehension"). In other cases, association with suspected criminals and flight at the approach of police officers has supported probable cause, but only in combination with additional factors. See *United States v. Davis, supra* note 29, 147 U.S.App.D.C. at 403 404, 458 F.2d at 821–822 (individual's association with narcotics users, surreptitious exchange of money for a package, flight and high crime area combined to support finding of probable cause); *Washington v. United States*, 130 U.S.App.D.C. 144, 145–146, 397 F.2d 705, 706-707 (1968) (association with known narcotics users, receipt of money in exchange for package, flight from officers and throwing away of packages containing narcotics combined to establish probable cause for individual's arrest); *Green v. United States*, 104 U.S.App.D.C. 23, 24-26, 259 F.2d 180, 181– 183 (1958), *cert. denied*, 359 U.S. 917, 79 S.Ct. 594, 3 L.Ed.2d 578 (1959) (association with known narcotics addict, flight on approach of officers and attempted unlawful entry into house of stranger in escape attempt supported probable cause).

**31.** See note 24 *supra* and accompanying text.

an innocent bystander.[32] Bearing in mind the "practical considerations of everyday life,"[33] I think the circumstances combinationally[34] might well have warranted "a reasonable, cautious and prudent peace officer"[35] "in the belief that an offense [was] being committed."[36]

This conclusion finds ample support in the case law of this and other circuits. Each factor operative here—flight,[37] association,[38] and presence at the scene of the crime[39]—is one that by our previous rulings may contribute in some degree to the appraisal on probable cause. Our prior adjudications additionally make clear that flight from the crime-scene, rather than from some other point, may augur probable cause for an arrest.[40] We have held, too, that

evidence of flight is admissible in a criminal trial on the issue of guilty knowledge when accompanied by appropriate instructions.[41] And it is worth noting that the Eighth Circuit, in the decision to which I have adverted,[42] expressly cautioned that the otherwise innocent conduct of an individual waiting outside a store while his companion inside passed a counterfeit bill might have "conveyed [an] overt indication of . . . criminality" had he attempted to flee upon observing his companion's arrest.[43]

This is not the first time we have been confronted by the problem we encounter with regard to Pugh. In *Hinton v. United States*[44] we found a similar collection of factors sufficient in unison to undergird a

**32.** See notes 25-26 *supra* and accompanying text.

**33.** See text *supra* at note 9.

**34.** See text *supra* at note 7.

**35.** See text *supra* at note 8.

**36.** See text *supra* at note 1.

**37.** See *Sibron v. New York*, 392 U.S. 40, 66 67, 88 S.Ct. 1889, 1904–1905, 20 L.Ed.2d 917, 936 937 (1968) ("flight at the approach . . . of law officers . . . [is a] proper factor[ ] to be considered in the decision to make an arrest"); *Husty v. United States*, 282 U.S. 694, 701, 51 S.Ct. 240, 242, 75 L.Ed. 629, 632 (1931) ("prompt attempt of [defendant's] companions to escape when hailed by the officers" contributed to establish probable cause for his arrest); *United States v. Davis, supra* note 29, 147 U.S. App.D.C. at 401, 458 F.2d at 822 ("flight has been a legitimate factor in a finding of probable cause"); *United States v. Curtis*, 138 U.S.App. D.C. 360, 363, 427 F.2d 630, 633 (*en banc* 1970) ("attempted flight was pertinent . . . on the issue of probable cause for arrest"); *Hinton v. United States, supra* note 29, 137 U.S.App. D.C. at 391, 424 F.2d at 879 ("flight from the police may provide 'additional justification' for an arrest and, 'when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime,' it may properly be considered in assessing probable cause") (footnotes omitted); *Coleman v. United States, supra* note 8, 137 U.S.App.D.C. at 53, 420 F.2d at 621 ("the element of flight in a vehicle from the scene of a crime may tip the scales in favor of probable cause"); *Jackson v. United States*, 134 U.S.App.D.C. 18, 22, 412 F.2d 149, 153 (1969) (flight from police may provide "additional justification" for an arrest);

*Green v. United States, supra* note 30, 104 U.S.App.D.C. at 25, 259 F.2d at 182 (because the suspect ran, "his precipitate action constituted one more circumstance to be taken into account by the officer who followed him").

**38.** See cases cited at *supra* note 30.

**39.** *Marshall v. United States*, 141 U.S.App.D.C. 1, 3, 436 F.2d 155, 157 (1970) (discovery of suspect shortly after robbery "one-hundred yards away from the bank in the direction the robber was seen to flee" was a factor in determining probable cause); *Coleman v. United States, supra* note 8, 137 U.S.App.D.C. at 53, 420 F.2d at 621 (proceeding on a logical escape route from scene of crime was an element in establishing probable cause).

**40.** See, *e. g., Coleman v. United States, supra* note 8, 137 U.S.App.D.C. at 52–53, 420 F.2d at 620-621 (flight from scene of a bank robbery); *Adams v. United States*, 118 U.S.App.D.C. 364, 336 F.2d 752 (1964), *cert. denied*, 379 U.S. 977, 85 S.Ct. 676, 13 L.Ed.2d 567 (1965) (flight from scene of a robbery); *Bell v. United States*, 108 U.S.App.D.C. 169, 170, 280 F.2d 717, 718 (1960) (flight from vicinity of a scream for help in early morning hours).

**41.** See *Bailey v. United States*, 135 U.S.App. D.C. 95, 100, 416 F.2d 1110, 1115 (1969); *Miller v. United States*, 116 U.S.App.D.C. 45, 47–51, 320 F.2d 767, 769-773 (1963); *Hunt v. United States*, 115 U.S.App.D.C. 1, 3–4, 316 F.2d 652, 654-655 (1963).

**42.** *United States v. Barber, supra* note 25.

**43.** 557 F.2d at 631.

**44.** *Supra* note 29.

probable cause determination. Hinton had accompanied a known drug user into an apartment building. He tried to escape through a corridor when his companion was arrested and searched by officers who had arrived at the building to execute a search warrant.[45] We found that the officers had probable cause to arrest Hinton.[46] We recognized fully that mere association and flight could not justify that result;[47] rather, the consideration tipping the balance was evidence connecting Hinton with·a possible violation of the narcotics laws.[48] Upon entering the building, he and his cohort had requested access to the very apartment designated for search in the officers' warrant and believed by them to be a narcotics "pad."[49] At the time of his arrest, Pugh, no less than Hinton, was in the company of suspected criminals, was present at the scene of the crime[50] and linked to it by apparent guilty knowledge evinced by his flight when approached by Secret Service agents. There is no break with precedent in a holding that this was quite enough.

### IV

I am satisfied, then, that there was prob-able cause for Pugh's arrest, though perhaps only barely so. It is immaterial that the Government's showing on that score possibly may not carry the day on the issue of actual guilt at his trial. We deal here with the adequacy of grounds for arrest and not with the caliber of proof prerequisite to conviction, and the difference between the two is critical.[51] For purposes of

**45.** 137 U.S.App.D.C. at 390, 424 F.2d at 878.

**46.** *Id.* at 391--392, 424 F.2d at 879 880.

**47.** *Id.* at 391, 424 F.2d at 879.

**48.** *Id.* at 391--392, 424 F.2d at 879 880.

**49.** *Id.* at 390–391, 424 F.2d at 878--879. We reasoned that if Hinton and his cohort "had been in [the apartment] when the police arrived, and if narcotics had been uncovered, there very likely would have been probable cause to arrest both." *Id.* at 391, 424 F.2d at 879 (footnote omitted). We concluded that "[w]hile [the police] could not be certain that the raid on [the apartment] would uncover narcotics or that [Hinton] knew where [his com-

probable cause "[t]he indicia of guilt need not be absolute, or even fully consistent; they may leave some room for doubt, and even for error. But they suffice . . . when they 'warrant a man of reasonable caution in the belief' of guilt."[52] In Pugh's case, I think they did.

panion] was taking him, . . . he could reasonably make both assumptions in deciding to arrest [Hinton], and that they served to anchor an incriminating implication possible from [Hinton's] flight." *Id.* at 391- 392, 424 F.2d at 879 880.

**50.** Pugh was arguably connected even more than Hinton with the scene of the crime; he was observed at two separate locations associated with the illegal scheme.

**51.** See text *supra* at note 5.

**52.** *Pendergrast v. United States, supra* note 5, 135 U.S.App.D.C. at 28, 416 F.2d at 784.