**UNITED STATES of America**

v.

**Fred GLOVER.**

**Crim. No. 82–315.**

United States District Court,
District of Columbia.

Dec. 20, 1982.

Theodore Shmanda, Asst. U.S. Atty., Washington, D.C., for Government.

Allan M. Palmer, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

Defendant is before the court charged with one count each of possession with intent to distribute heroin and cocaine, which are felonies in violation of 21 U.S.C. § 841(a), one count of carrying a firearm during the commission of a federal felony, 18 U.S.C. § 924(c), and one count of carrying a pistol without a license in violation of 22 D.C.Code § 3204. Defendant seeks to suppress, as the product of an illegal arrest, the gun seized from him on September 24, 1982, when F.B.I. agents arrested him believing that defendant was Larry Mathis, a fugitive. Defendant also seeks to suppress, as a product of an illegal search, the heroin and cocaine seized from the apartment of a third person, where officers believed Mr. Mathis was hiding. This court held a two-day evidentiary hearing on the motion to suppress and entered its oral findings and ruling at the conclusion of the testimony. The court held the government had met its burden as to the reasonableness of the arrest, albeit a case of mistaken identity, and denied defendant's motion to suppress the loaded pistol found on him. Additionally, the court ruled the defendant had a reasonable expectation of privacy in the apartment which had been the subject of a warrantless non-consensual search by the F.B.I. and granted the defendant's motion to suppress the narcotics seized therein. The following findings of fact and conclusions of law supplement the earlier oral opinion.

Since the reasonableness of the agents' arrest of Fred Glover must be evaluated in light of all the circumstances surrounding that arrest, *United States v. Allen,* 629 F.2d 51 (D.C.Cir.1980), a summary of the events which led up to the September 24, 1982 arrest is helpful. Larry Mathis, along with two other defendants, Eddie Mathis, who is Larry's brother, and Harry Jackson, were charged with the September 25, 1981 first degree murder of Mark Jackson. Beginning in May, 1982, an informant advised the United States Attorney that Larry Mathis knew he was going to be indicted and planned to hire an individual to kill the prosecutor in the case.[1] Fred Glover, an associate of Larry Mathis, was also identified as one of the persons possibly involved. The F.B.I. became involved in the investigation of Larry Mathis because of these threats. Detective Robert Lee of the D.C. Metropolitan Police Department testified that beginning in May, 1982 the F.B.I. agents were provided with pictures of both men as well as several other known associates of Mathis. While Eddie Mathis and Harry Jackson were apprehended in connection with the murder case, Larry Mathis remained at large. On July 30, 1982, a bench warrant was issued by the D.C. Superior Court for Larry Mathis. Within a week, Detective Lee, an officer with twenty-one years general experience as a D.C. police officer and ten years of specialized experience in the Intelligence Division of the force, who had known Larry Mathis for over fifteen years, sent a nationwide teletype lookout for Mathis. The lookout described Larry Mathis as a negro male, with date of birth November 19, 1951, 5' 11" tall, weighing 180 pounds, with short black hair, short beard and mustache. The teletype also stated that Larry Mathis was wanted for first degree murder and should be considered armed and extremely dangerous. Detective Lee testified that on September 15, 1982, an informant advised him that he had seen Larry Mathis driving a dark car with D.C. tags 736–798. The license tags were traced to a Dodge Challenger owned by Ms. Susie Herring who lived at 429 N St., S.W., Apt. 501. On September 17, 1982, this information was communicated to F.B.I. agents during a meeting at the offices of the United States Attorney. Additionally, the F.B.I. received the same information from the informant as given to Detective Lee. Detective Lee testified that on September 22, 1982, at approximately 7:00 P.M. he spotted Larry Mathis driving the Dodge with those tags. He radioed to the F.B.I. and Metropolitan Police Department

---

1. The threats were directed at A.U.S.A. William O'Malley, the prosecutor assigned to the Grand Jury which was investigating the Mark Jackson murder.

and followed the vehicle but lost it in traffic. Pursuant to discussions with the F.B.I. at the September 17, 1982 meeting, Detective Lee agreed to stay away from Ms. Herring's apartment complex since if Larry Mathis saw him there his suspicions would be aroused and he might not return.

Special Agent John Heick, who worked on the F.B.I.'s Fugitive Squad and had seven years experience, testified that on September 20, 1982, he and other F.B.I. agents began developing their own source in the neighborhood of the Tiber Island apartment complex. Agent Heick testified that this citizen source had no prior convictions, was in a position of trust and confidence, and was able personally to view events at the apartment. He testified that on September 20, 1982, the source either corroborated or supplemented the following information previously possessed by the F.B.I. and M.P.D.: (1) On September 20, 1982, the source saw someone driving the Dodge Challenger drop Ms. Herring off at her apartment; (2) when shown an M.P.D. photo of Larry Mathis, the source advised that he had seen that man driving the Challenger and entering the apartment. When shown a picture of Glover, the citizen source advised that he had seen Fred Glover there also but was not aware of any other black males going to the apartment. Agent Heick testified that the source did not indicate if one individual frequented the apartment more than the other. On September 22nd, 23rd and 24th, 1982, F.B.I. agents spot-checked the area of the apartments at 429 N St., S.W. during the day and set up surveillance of that area from approximately 5:30 P.M. to 12:00 A.M. Special Agent Deborah Martin, an F.B.I. agent with two and one-half years experience in the Bureau, who was investigating Larry Mathis in connection with the alleged threats against AUSA O'Malley, testified that after September 17, 1982, she worked together with Agent Heick, who sought Mathis on the first degree murder warrant. Agent Martin testified that on the morning of

September 22, 1982, all of the F.B.I. agents working on the Larry Mathis case agreed that with the upcoming trial of the Jackson murder, they would make an all-out effort to find Larry Mathis. They canvassed all the areas Mathis was known to frequent to no avail.[2] Agent Martin testified that on September 24, 1982, at approximately 6:00 P.M. she heard a call for Agent Heick over her radio that Mathis was spotted at 429 N St., S.W. When Agent Heick failed to respond promptly, Agent Martin drove to that location, which was less than five minutes away from her. She testified that when she arrived she saw the black Dodge parked in front of the apartment. Agent Martin parked in the opposite direction, down the street about 10–15 car lengths away and for the next several minutes awaited the arrival of other F.B.I. agents. After several minutes, through her rearview mirror Agent Martin saw a negro male leaning face forward against the car on the side of the car nearest the sidewalk but facing the street. From this vantage point Agent Martin could thus see the left side of the individual leaning against the car. She testified that he either stood by the car or leaned against it for up to ten minutes and she got the impression, by the way he lounged on the car, that he either owned the car or had some connection with it—i.e., he acted as if he had some proprietary interest in the car. Agent Martin testified that another F.B.I. agent, Special Agent Mardigian, advised her that the individual was Larry Mathis. Agent Martin testified that then a white Mercedes pulled up beside the Dodge and the man who had leaned against the Dodge climbed into the back seat of the Mercedes which began to drive away.

Special Agent George Chmiel, an F.B.I. agent for twelve years, was working in the FBI's Washington Field Office when he received a radio call from Agent Martin on September 24, 1982; he then responded to 429 N St., S.W. Agent Chmiel testified

---

2. All the agents had pictures of both Larry Mathis and Fred Glover. They testified the faces depicted therein were not similar.

that he parked his car in a lot approximately 30 yards to the west of, but facing, the Dodge Challenger. Agent Chmiel testified that at 7:00 P.M. he received a call from Agent Mardigian that the subject was standing next to the car. Agent Chmiel testified that he saw a negro male standing beside the car and sitting on the back of the car and that from what he could see that individual matched Larry Mathis as to height and weight.

Agent Stephen Mardigian, an F.B.I. agent for seven years, testified that he was seeking Mathis in connection with the fugitive investigation and responded to the area of 429 N St., S.W., approximately 15–20 minutes after he received the call on September 24, 1982 at 6:15. When Agent Mardigian arrived, he contacted the citizen source he had developed with Agent Heick who advised him that the fugitive had come into the building wearing a dark green leather jacket and a brown felt hat and had gone up to apartment 501 in the building. Agent Mardigian testified that he knew that the person who lived at that apartment owned the Dodge. Agent Mardigian testified that when he had the car he was in drive by to take a look at the area, he had only expected to see the Dodge parked in front of the apartment and was surprised to see anyone standing beside it. He testified that though he was 10–15 feet away, he could only view the individual from the shoulders up. Agent Mardigian testified that it was dusk and quite dark but the man he saw resembled Larry Mathis as to height, weight and general appearance. He did state he thought the man was 5′ 6″ to 5′ 7″ but later on cross-examination stated that was wrong. Based on his concern as to the identity of the individual who was wearing neither a green jacket nor a felt hat, he re-contacted the citizen source via the radio phone in his car and asked him whether the fugitive had left the building. The citizen source said the fugitive had left. Agent Mardigian testified that the citizen source then confirmed that the subject had left the building not wearing the hat or coat. Agent Mardigian testified that as he was speaking to the source Agent Chmiel

called to advise that a white Mercedes had pulled up to the Dodge and the individual who had been leaning against the Dodge had climbed into the back seat of the Mercedes, which was leaving. At that point, Agent Mardigian ordered the other agents to stop the Mercedes. Agent Martin pulled her car in front of the Mercedes to block it. Agent Chmiel approached the Mercedes, placed his gun inside the driver's open side window, pointed it at the man in the back seat and said, "F.B.I. Don't move, Mathis." In accordance with FBI procedures for the initial detention of armed suspects, the suspect was told to get out of the car and to lie face down on the ground. Afterwards, when he was being helped to his feet by the agents, they observed the butt of a gun protruding from his waistband. The gun was taken from the subject.

One of the agents obtained his driver's license. Agent Chmiel testified that it was only at this point when he compared the photo on the license with the individual before him that he realized that the man they had arrested was not Larry Mathis. According to Agent Martin, she almost simultaneously came to the same realization. Agent Mardigian testified that he immediately contacted the citizen source in person and relayed that the individual leaning against the car was Fred Glover and not Larry Mathis. When shown a picture of Fred Glover at this point, the citizen source stated that that was not the man he had been talking about, and that Larry Mathis was still upstairs. Agent Mardigian testified that within five minutes after their arrest of Fred Glover, he had obtained a passkey from the janitor of the apartment building and had knocked on the door to apartment 501. Agent Mardigian testified that he heard what he thought were voices on the other side of the door, announced himself, knocked several times, and upon hearing no response, gained entry via the passkey. On the table just inside the front door in different size packets were the heroin and cocaine, which later yielded four fingerprints of Fred Glover. The TV was on but no one was in the apartment. Larry

Mathis was not found in the apartment or in the surrounding area. Another loaded pistol was found in the apartment that is not a subject of this motion.

Susie Mae Herring testified that she was the owner of apartment 501 (a co-op), that Fred Glover had given her $2,000.00 toward the purchase of the apartment, which was the down payment, that though he was not living at her apartment and received no mail there, he did have his own closet in the apartment where he kept suits, jackets, shoes and other belongings. She testified that he was the only other person who had a key to the apartment, and to the lobby, that he had 24 hour a day access to it, that she often left notes for him in the apartment when their schedules prohibited them from meeting, that she had received telephone calls for him there and he had slept over there for brief periods. She testified she believed he had a proprietary interest in the apartment and would share in any profits if she sold it in the future. She stated he had a right to use the apartment as he wished at any time except he was not to bring another woman there. Fred Glover also gave her the $4,000.00 down payment for her Dodge Challenger, had his own set of keys to the car, and had borrowed it from her over a week before he was arrested in this case. She never had met Larry Mathis and was not aware he had driven her car.

### I. Motion to Suppress the Gun

■ Under *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), the arrest of an individual in the belief that the individual is another whom the officers seek to arrest, is not invalid if two criteria are met. First, the officers must have probable cause to arrest the individual they seek, and second, they must have had a reasonable and articulable basis for believing that the arrestee was the person they sought. Applying the facts in this case to the standard in *Hill,* it is clear that the first prong of the *Hill* test is met. The officers had probable cause to arrest Mathis; he had been indicted by a Grand Jury and the officers possessed a warrant for his arrest for murder.

■ The court recognizes that the subjective good-faith belief of the officers is insufficient to validate the arrest. *Hill, supra,* at 804, 91 S.Ct. at 1110–11. Rather, the court must consider the totality of the circumstances surrounding the arrest, *United States v. Allen,* 629 F.2d 51, 56 (D.C.Cir. 1980), to determine if those facts would provide a reasonable basis for the officers' belief that the arrestee is the person they were seeking. Consideration of the totality of the circumstances requires that the facts before the arresting officer must not be dissected and viewed singly; they are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training. *United States v. Young,* 598 F.2d 296 (D.C. Cir.1979). The agents' decision to arrest Fred Glover was based not only on their own observations but on the observations of two citizen informants. Furthermore, many of the details provided by the informants were later corroborated by the officers and agents investigating the case. The officers believed that the individual standing by the Dodge Challenger was the fugitive Larry Mathis based on the following facts: (1) They had received information from a citizen informant that Mathis had been seen driving a Dodge with D.C. tags 736–798; (2) a MPD police officer who had known Larry Mathis for over 15 years had later spotted Larry Mathis driving the same car; (3) the car was traced to a woman who lived at 429 N St., S.W., apartment 501; (4) a citizen source developed by the F.B.I. in that neighborhood advised after viewing pictures of Larry Mathis and Fred Glover that it had seen both men going into the building and into apartment 501 and using the car; (5) the officers had viewed the area for four days and nights, had not seen either Mathis or Glover, and had not arrested anyone else; (6) they received information on September 24, 1982, from the informant that it had seen Mathis and the car and that Mathis was in the apartment; (7) from the vantage point of the agents in the twilight conditions, who had to keep a reasonable distance to prevent their own detec-

tion, Fred Glover generally resembled Larry Mathis: both men were dark complected and had short hair, although Fred Glover did not have a beard. While the officers' own observations or the informants' information may not have *independently* provided a sufficient basis for the officers to mistake Glover for Mathis, the informants' information, corroborated by the officers' observations combined to provide such a sufficient basis.

█ Logically, any information which may have caused the officers to question whether Fred Glover was Larry Mathis must also be considered in determining whether the agents' arrest was reasonable. The court has reviewed the pictures of Fred Glover and Larry Mathis and agrees with the agents who testified that, in their pictures, these individuals do not look alike. Other facts which caused them to question were that Mathis was two inches shorter and ten pounds heavier than Glover and had a beard. It should be noted, however, that from a distance these differences may not have been as discernable. Additionally, Agent Mardigian testified that when he spotted the individual leaning against the Dodge, he noticed that the individual was not wearing a green leather jacket or a felt hat as the informant had described. Agent Mardigian responded by recontacting the citizen source and questioning the discrepancy which was satisfactorily answered by the citizen source believed reliable. Immediately thereafter the agents had to move to stop the departing Mercedes. Courts have suggested that under circumstances such as these, an interim investigation by the officer is the appropriate procedure. *See United States v. Allen,* 629 F.2d 51, 59–60 (D.C.Cir.1980) (Bazelon, J., dissenting). In *Sanders v. United States,* 339 A.2d 373, 379, the D.C. Court of Appeals stated,

> Should doubt as to the correct identity of the subject of the warrant arise, the arresting officer obviously should make im-

mediate reasonable efforts to confirm or deny the applicability of the warrant to the detained individual. If, after such reasonable efforts, the officer reasonably and in good faith believes that the suspect is the one against whom the warrant is outstanding, a protective frisk pursuant to the arrest of that person is not in contravention of the fourth amendment.

When questioned, the citizen source advised Agent Mardigian that the fugitive had left the apartment building without a hat or coat. Based on this information, Agent Mardigian could reasonably reaffirm his belief that the individual he saw standing by the car was Larry Mathis.

Based on the nature and extent of the information known to the officers at the time of their arrest of Glover, the court distinguishes *United States v. Rosario,* 543 F.2d 6 (2nd Cir.1976), cited by defendant in support of his motion to suppress. In that case, police officers had been seeking a known narcotics dealer named Gonzales and had a limited description of his accomplice, "Angel." When Gonzales was arrested, an individual present identified himself as Angel; he was subsequently arrested and searched and packets of heroin were retrieved from his jacket pocket. The officers later discovered that they had arrested the wrong "Angel." In *Rosario,* the court found that the officers did not obtain enough information to have probable cause to arrest Angel Rosario, and furthermore, the search of Rosario was impermissible under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), since the officers lacked an indication that Rosario was armed and dangerous. *Rosario, supra,* at 8 & n. 2.

Considering their demeanor, experience, the photographic exhibits of the apartment complex and street area and the above facts, the court finds Detective Lee and the FBI agents to be credible witnesses[3] and

---

**3.** At the suppression hearing, defense counsel presented Agent Mardigian with his prior testimony before the Grand Jury where he stated, "... he was seen getting into another car and leaving. We couldn't allow this to hap-

pen without identifying him. We couldn't allow a person wanted for murder to possibly get away. We had to stop the vehicle if for nothing more than just to ascertain whose

therefore finds that the totality of the circumstances in this case would support the agents' reasonable belief that the individual at the car was Larry Mathis. As the Court in *Hill, supra,* 401 U.S. at 804, 91 S.Ct. at 1110–11, stated, "Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before the court the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time"; *accord, United States v. McEachern,* 675 F.2d 618, 622 (4th Cir.1982).

The Court therefore denies the motion to suppress the gun seized from Mr. Glover on September 24, 1982.

## II. *Motion to Suppress the Heroin and Cocaine*

 Within ten minutes of Fred Glover's arrest, FBI agents, who believed that Larry Mathis was hiding in Susie Mae Herring's apartment, entered that apartment without consent and seized heroin and cocaine without a search warrant. When plastic bags containing those drugs revealed four fingerprints of Fred Glover, he was subsequently charged with possession of heroin and cocaine with intent to distribute, 21 U.S.C. § 841(a). The government has raised the issue of whether Mr. Glover has standing to contest the seizure of drugs from the residence of a third party. Under *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the defendant has the burden of demonstrating that he has a reasonable expectation of privacy in a residence not his own so that he may assert that his fourth amendment rights have been violated. The court is satisfied that the defendant has met this burden. Ms. Herring testified that Mr. Glover was the only other individual who had keys to her apartment, that he had 24-hour access to it, kept his clothes there, slept there even if only to take naps, received phone calls there and kept his television set there. Additionally, she testified that she would frequently leave messages in the apartment for him.

Once the defendant has satisfied this threshold burden, the next inquiry is whether the drugs seized in that search must be suppressed. The search of Ms. Herring's apartment was conducted without a warrant. The facts in this case closely parallel those in *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). In that case, Drug Enforcement Administration officials possessed an arrest warrant for Ricky Lyons, a federal fugitive. Based on an informant's tip that Lyons could be found within the next 24 hours at a certain address, the agents went to the address. They frisked two men, Hoyt Gaultney and Gary Steagald, whom they saw standing in front of the house but discovered that neither man was the man they were looking for. The agents entered the house and searched it without a search warrant. The search yielded drugs and Steagald was later charged with their possession. In *Steagald, supra,* at 216, 101 S.Ct. at 1649–50, the Supreme Court held that officers who possessed an arrest warrant for an individual would need a search warrant to search for that individual in a third person's home. The Court made clear that this would be the rule in the absence of consent to search or exigent circumstances, two of the recognized exceptions to the search warrant requirement.

The government asserts that exigent circumstances existed in this case and thus validated the warrantless entry and search of Ms. Herring's apartment. Once exigent circumstances lawfully placed the FBI agents in Ms. Herring's apartment, the government argues that the drugs were

---

identity that was." *See* Defendant's Exhibit 3.

The court finds that Agent Mardigian's testimony, as a whole, supports his reasonable belief that Fred Glover was Larry Mathis. Agent Mardigian's testimony before the Grand Jury is not inconsistent with his reasonable belief that the person he had seen standing next to the Dodge was Larry Mathis. This belief, though not certain, was probable, and thus satisfies the test in *Hill, supra.* His subsequent ordering of the FBI agents to stop the Mercedes was a reasonable response to the situation, wherein a believed armed murder fugitive was about to leave the area.

within the agents' "plain view" under *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), and could thus be seized. The court deems it unnecessary to reach the "plain view" analysis based on its determination that there existed no "exigent circumstances" which could lawfully place the agents inside Ms. Herring's apartment without a warrant.

In *Dorman v. United States,* 435 F.2d 385, 392–93 (D.C.Cir.1970), the court listed certain factors that were material to a determination of whether exigent circumstances necessitated a warrantless search. They are:

(1) that a grave offense is involved, particularly a crime of violence;

(2) the suspect is reasonably believed to be armed;

(3) a clear showing of probable cause that the suspect committed the crime involved;

(4) a strong reason to believe that the suspect is in the dwelling;

(5) the likelihood of the suspect's escape if not swiftly apprehended;

(6) there has been a peaceable entry as opposed to a "breaking"; and

(7) the time of entry (night or day).

Against these factors, the court must weigh the delay that would have been involved in securing a warrant. *Dorman* at 394.

In this case, the court finds the first three factors present. As has already been discussed, the agents possessed an arrest warrant for Larry Mathis and therefore had probable cause to arrest; they also had information that he was to be considered armed and extremely dangerous. The court cannot find that the officers possessed sufficiently strong evidence that Mathis was in Ms. Herring's apartment to justify their intrusion into that apartment without a search warrant. The court finds the fourth and fifth factors of the *Dorman* tests to be interrelated in this case. Based on the facts known to the officers at that time (i.e., that they had just arrested a man the informant incorrectly advised was

Mathis, and that the informant nevertheless told them that Mathis was in the apartment) and that there were a sufficient number of agents to secure the exit to the Herring apartment to prevent Mathis' escape had he been in the apartment, the court finds that the more appropriate response would have been to wait and see if Mathis came out. *Steagald v. United States,* 451 U.S. 204, 221, n. 14, 101 S.Ct. 1642, 1652, n. 14, 68 L.Ed.2d 38. Additionally, the court notes that, while several agents secured the exits, another agent could have made a telephonic request for a search warrant. *United States v. Strother,* 578 F.2d 397, 400–01 (D.C.Cir.1978). On the final two factors, the court notes that Agent Mardigian testified that the entry into Ms. Herring's apartment was accomplished by a passkey and therefore involved no breaking and the entry occurred in the early evening hours. The agents knew there was no other exit to her apartment except a balcony on the 5th floor. There were sufficient agents to post the only door to prohibit any escape while others arranged for a search warrant.

The court finds that the facts in this case more closely resemble those in *Lindsay v. United States,* 506 F.2d 166 (D.C.Cir.1974), and compel it to conclude, as the court did in *Lindsay,* that the government has failed to demonstrate the "urgent need" to justify the warrantless entry. *Lindsay* at 171–72. Therefore the court will grant the motion to suppress the heroin and cocaine.

Accordingly, it is hereby this 20th day of December, 1982,

ORDERED that defendant's motion to suppress the gun seized from him on September 24, 1982, is DENIED and defendant's motion to suppress the heroin and cocaine and related items described in the indictment seized on September 24, 1982, is GRANTED.