**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Danny Ray WORKS and Gaye William Brown, Defendants-Appellants.**

**No. 75–1539.**

United States Court of Appeals, Fifth Circuit.

Feb. 9, 1976.

Joe J. Johnson, Jr., Fort Worth, Tex. (Court-appointed), for Works.

Roland H. Hill, Jr., Fort Worth, Tex., for Brown.

Frank D. McCown, U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GEWIN, BELL and SIMPSON, Circuit Judges.

GEWIN, Circuit Judge:

Appellants Danny Ray Works and Gaye William Brown were convicted under Count I of an indictment charging a conspiracy,[1] from September 16 through September 21, 1975, to possess with intent to distribute and to distribute lysergic acid diethylamide (LSD).[2] Appel-

---

1. Patricia Jean Works, wife of Danny Works, was indicted as a co-conspirator and was convicted, but she is not a party to the appeal.

2. In violation of §§ 401 and 406 of the Controlled Substances Act, 21 U.S.C. §§ 841(a)(1) and 846 (1970).

lants were also convicted under Count II of the substantive offense of possession with intent to distribute LSD.[3] Additionally, appellant Brown was convicted under Count III of the indictment, which charged him with assaulting federal officers.[4] Both appellants were sentenced to two years on both Counts I and II and Brown was sentenced to six years on Count III, all sentences to be served concurrently.[5] We affirm. Since the factual setting and sequence of events are quite important in this case, we will set out below the occurrences in rather detailed fashion under each relevant date.

### A. *September 4, 1974*

This date is not encompassed within the indictment time span. Nevertheless,

3. In violation of § 401 of the Controlled Substances Act, *id.* § 841(a)(1).

4. In violation of 18 U.S.C. § 111 (1970). Brown was also charged under another count, but it was severed and is irrelevant to this appeal.

5. Appellants were also sentenced to special parole terms.

6. The conversation took place in the course of an investigation by Grafton of Works for possible illicit firearms activities. In the course of *voir dire* examination of Grafton by defense counsel, outside the presence of the jury, Works' counsel moved the court, "to instruct [Grafton] not to mention firearms, or that portion of the conversation with this defendant, or in any of the conversations he may have had during the course of these negotiations concerning drugs, on the ground that it is an attempt to prejudice this jury by talking about firearms and possibly bringing in extranneous (*sic*) investigations, investigations of extranneous (*sic*) offenses unrelated to anything charged in the indictment before the Court here." As a result of this motion, the following rulings were made by the trial court:

THE COURT: I am going to sustain the objection to going into those matters relative to the guns. The Court will let him testify he had a conversation about other matters, but not go into those matters; and in the course of the conversation about other matters then this matter arose, and what was said concerning it.

\* \* \* \* \* \*

THE COURT: I will let him testify about conversations that led him to narcotic matters. . . .

Special Agent Grafton of the Bureau of Alcohol, Tobacco and Firearms (ATF) testified without objection that on this date, in the course of a conversation, appellant Works informed him that "he sold a few pills."[6]

### B. *September 11, 1974*

This date is not encompassed within the indictment time span. ATF Agent Grafton testified that on this date, "Danny Works advised me that he was taking 40,000 tabs of LSD hits—excuse me, Mescaline, to a friend of his named Alex in Durant, Oklahoma." There was no objection to this testimony. Grafton also testified that he saw a pistol hanging on a wall in Works' house, which is located in Fort Worth, Texas.

THE COURT: [I] am sustaining the objections of getting into extranneous (*sic*) offenses. These people are charged with narcotics, with heroin—not heroin, but narcotics, and to get into other extranneous (*sic*) matters, the Court will sustain the objection to that.

\* \* \* \* \* \*

THE COURT: Now it is the ruling of the Court at this time that I will not permit this witness to go into testimony relative to the purchase of firearms, machine guns and the rifle and things of this kind. You can testify about the occasions you met with this defendant on each occasion, you can testify you went over to some guy's house named Don, that you went over there with him and the time elements and things of this kind . . . [T]he testimony that has been given about machine guns and rifles, I am instructing you not to go into that at this time. You can say you had other conversations about other matters and you can testify to any statement made by anyone in your presence concerning any type of narcotics.

GRAFTON: Yes, sir.

THE COURT: Sales of narcotics in any forms. Now is there any question? Is it clear now.

[ASSISTANT U. S. ATTORNEY]: Yes, Your Honor.

There was no objection or disagreement by any defendant to the above ruling of the court and no suggestion that the ruling was unacceptable or should be clarified. The initial objection related to testimony concerning firearms.

## C. *September 16, 1974*

On this date Agent Grafton and Special ATF Agent Larry Arnold met Works at his residence and accompanied him to a house occupied by one Don and his family. While there, Grafton testified over objection that "two high school-looking kids" came by and asked Don if he had any marijuana. After this testimony Works' motion for a mistrial was denied, but he was granted his request that the jury be instructed to disregard this evidence.[7]

Grafton went on to testify that during the trip back to Works' residence, there was some discussion of drugs among Arnold, Works and himself. Grafton testified that Arnold told Works that he (Arnold) would like to get a load of mescaline to take to Laurel, Mississippi because "hallucinating drugs were hard to get" in that area. Grafton further testified that Works said he would be receiving a load of mescaline from Austin by means of a "runner", whom he would meet on a deserted farm south of Fort Worth. Works offered the drugs for 45 cents per "hit",[8] and Arnold and Grafton indicated their interest in obtaining two to four thousand "hits." Works said the drugs could be expected in three or four days.

Agent Arnold confirmed Grafton's account of the conversation, but added, over objection, two crucial factors. First, Arnold testified that Works said he was going to have a friend with a high-powered rifle guarding the farm where the mescaline was to be picked up.[9] Secondly, Arnold testified that Works said his sister in high school sold mescaline for him and that she would take at least 1000 hits of it. Works' attorney objected to this testimony as involving an extraneous offense and be-

---

7. The transcript reveals the following with respect to this testimony:

   GRAFTON: While we were in there two high school-looking kids came by and asked [Don]—
   [WORKS' ATTORNEY]: —Your Honor, at this time we are going to object to what someone else might have done on this occasion with reference to drugs, not related to Danny Works.
   [PROSECUTOR]: Your Honor, I think he testified this discussion was in the presence of Danny Works.
   THE COURT: Did this take place in the presence of defendant Danny Works?
   GRAFTON: Yes, sir, it did.
   THE COURT: All right, I will overrule the objection.
   [PROSECUTOR]: What was said in the presence of Danny Ray Works at that time on the 16th?

   GRAFTON: The two kids came by, the two boys, and asked [Don] did he have any grass and he said, "No, I don't have any, I should have some tomorrow." And so they left his residence.

   [WORKS' ATTORNEY]: Your Honor, we are going to request that the jury be instructed not to consider this for any purpose, this evidence, against Danny Ray Works, since he had nothing at all to do with the transaction or conversation.

   THE COURT: I am going to carry that request along at this time . . .

   [PROSECUTOR]: Did Danny Ray Works have any discussion related to drugs in that residence at that time?
   GRAFTON: I don't recall him saying anything to the guy pertaining to the marijuana.
   [PROSECUTOR]: Your Honor, the Government then would not object to the request.
   THE COURT: All right, I am going to grant the motion of the defendant that you will not consider this evidence concerning marijuana or grass with regard to the defendant Works. You will disregard that. It has no bearing or relevancy and you will not consider it for any purpose whatsoever.
   [WORKS' ATTORNEY]: In order to protect the record for Mr. Works, I will move for a mistrial.
   THE COURT: Your motion is overruled and denied.
   [WORKS' ATTORNEY]: Note our exception.
   Agent Arnold also indicated his willingness, outside the jury's presence, to expand on this incident, but the trial judge indicated his belief that the prosecution should "stay away from it." Thereafter Arnold avoided any mention of the incident in his testimony.

8. A "hit" is drug jargon for one dosage unit, such as a pill or a tablet, of a narcotic. *See* Record, vol. II, at 146; vol. III at 271.

9. The context of this remark by Works was that Arnold had offered to accompany Works to the pick-up point. Works then explained that he should not need any help because of the rifleman's presence.

ing highly prejudicial and irrelevant, but the objection was overruled.[10]

### D. September 20, 1974

Agent Grafton testified that at about 12:30 p. m. he and Agent Arnold went to Works' residence where they spoke to Patricia Jean Works, Danny's wife. Grafton testified that Mrs. Works said Danny "was out doing business; that the guy from Austin came up that morning and brought him some LSD. . . ." She said Danny was out collecting money and would be back at any time. Grafton further testified[11] that Mrs. Works told him that the "runner" had gone back to Austin to pick up some more narcotics, from which the agents' 2000 "hits" would come. Grafton told Mrs. Works he would be back later.[12] The agents then left the Works' residence.

At 5:30 or 6:00 p. m. Agents Grafton and Arnold returned to the Works' house. Danny Works was present then and Grafton asked him "had the drugs come in," to which Works replied in the negative.[13] Accordingly, the agents left the residence and returned in about an hour. The runner had still not arrived, however, so Grafton left his phone number and asked Works to call him when the source did arrive.

### E. September 21, 1974

Before Agents Grafton and Arnold returned to the Works' residence after midnight, other ATF agents and Houston policemen placed the location under surveillance. In the early morning hours of September 21, Grafton and Arnold arrived at the residence. Several persons, including the appellants, were at Works' house at that time.

Danny Works and Agent Grafton stepped onto the porch to discuss their narcotics deal. Grafton "asked him [Works] had he received the drugs[14] and he stated that all he had was four or five hundred tabs of LSD left," and, "told him we would take that and he advised us it was going to be 65 cents a tab rather than 45 cents and I told him we would pay the price for it." Grafton

---

**10.** The exact testimony is as follows:

[ARNOLD]: [Works] said that this Mescaline that he was going to get in, he said that what he usually did with it, or what he did with some of it was that he had a sister in high school and said his sister sold it for him.
[WORKS' ATTORNEY]: Your Honor, we will object to this extraneous (sic) offense. It is highly prejudicial to the rights of this defendant and has no bearing on any issue under this indictment before this Court.
THE COURT: The objection is overruled.
[WORKS' ATTORNEY]: Note our exception.
[ARNOLD]: He said that his sister sold this narcotic for him before and that she was going to take at least 1000 hits of it.

**11.** In response to the question, "[D]id you ask her about any narcotics?"

**12.** Agents Grafton and Arnold also testified that they asked Mrs. Works about the pistol that Grafton had seen on the eleventh, and she said Danny had it on his person. Arnold's testimony with respect to the narcotics was as follows:

[PROSECUTOR]: [D]id [the] conversation [with Mrs. Works] relate to drugs?
[ARNOLD]: Yes, it did.

[PROSECUTOR]: What was the conversation?
[ARNOLD]: Well, I asked her if the narcotics was in, had it come . . . and she said that 500 hits had come in . . . that Danny had it with him, he had gone to sell it. I asked her what form it was in and she said it was caps, meaning capsules, I assume, and sugar cubes.
* * * * * *
[S]he said [Danny] should be back at any time, but we could come back around 6:00 o'clock or so.

**13.** Arnold testified:

Well, I asked him if the stuff was in, if the narcotics was in, and he said he had 500 hits that had come in but that he had already sold it to a friend, and that he was expecting 5000 more, just anytime, that he had sent a man back to Austin to pick it up, and he said we could come back in about an hour.

**14.** Agent Arnold testified that he asked Works "did he have the stuff", to which Works answered "Yes" and explained that it was in "sugar cubes and caps." Works then showed Arnold a sample of the narcotics, which had been hidden inside a motorcycle helmet.

also saw the revolver that he had seen earlier that evening on the Works' couch.

The actors then began negotiating the mechanics of the transaction: Works expressed the desire that one agent go with him and another with Brown, but the two agents insisted on staying together. Meanwhile, appellant Brown began walking across Works' front yard.[15] Brown then called to Works, telling him to " 'come here,' " but Grafton objected to Works' going to Brown. Brown then walked to the house, simultaneously telling Works to come to him. When Brown reached the house he obtained the pistol from inside the front door and pointed it at the two agents. The agents were told by Brown to put their hands up. After various maneuverings a gun battle ensued, leaving Brown and several of the other civilians injured.[16]

Arnold testified that after investigating and securing the house, he returned to where Brown lay wounded on the ground and "asked him how he was and he said he was hit but he thought he was okay. And he said, 'Did you get the stuff yet?' and I said, 'No, not yet.' And

he said, 'It is by the bush.' And I walked over to the bush." [17] The agents then recovered the LSD under that bush, which was located on the lot adjacent to Works'.[18] Both appellants objected to the introduction of the narcotics evidence on the grounds of no proper predicate and failure to show a custodial or possessory nexus with the appellants. These objections were overruled, just as defendants' earlier motion to suppress had been denied. We turn now to consideration of the appellants' arguments that their convictions should be reversed.

Appellants' major point of contention is that the trial court committed reversible error by allowing into evidence the testimony of Agents Grafton and Arnold about narcotics other than LSD (mescaline and marijuana). We have concluded that, although the admission of some or possibly all of this evidence was indeed error, under the facts and in the circumstances revealed by the record in this case that error was harmless beyond a reasonable doubt and the convictions are affirmed pursuant to the concurrent sentence doctrine.[19]

15. Apparently, Brown was walking toward the point where the narcotics were cached because when Grafton objected to Brown's walking into the darkness, Works replied, "Well, he [Brown] knows where the stuff is at. He is the only one that knows where it is at." Agent Arnold testified to substantially the same occurrence and conversation. *See also* note 17 *infra* and accompanying text.

16. Agents Grafton and Arnold testified that Brown had had the pistol pointed at them and then toward a surveillance officer. The agents also testified that another person present at the Works' residence appeared to be pointing a pistol at them. The agents testified that they then heard a shot, at which time they opened fire on Brown. Subsequently it was determined that the pistol in Brown's possession had never been fired.

17. The bush was located in the same direction that Brown had earlier been walking.

18. At trial the recovered narcotics were adequately identified by the agents and the chain of custody was established. The drugs that Works had shown Arnold as a sample also were introduced.

19. Appellants also contend that the error was magnified here because the allegedly immaterial and highly prejudicial aspects of some of the testimony was emphasized by the government in its closing argument to the jury. We agree with appellants that the potential harm caused by the evidence was possibly magnified by the government's closing argument. In some cases such magnification may cause otherwise harmless error to rise to reversible proportions, but this is not such a case. The admission of the testimony was harmless error and the prosecution's comments on it in closing argument constituted a reasonable inference drawn from that testimony. The comments were in apparent response to defense questioning and testimony that implied disregard by the agents for the safety of children, *see* Record, vol. II at 254–55, vol. III at 416–18, 422–24, 456, 477–78. Moreover, immediately after the challenged argument the trial court quite correctly instructed the jury that: "What the lawyers say is not evidence and you will not consider it as such. You will only consider the evidence you heard from the stand."

■ Appellants first argue that the trial court erred in not granting a mistrial after Grafton's testimony about the conversation between Don and the two boys concerning a marijuana deal.[20] Works was present at this conversation, but was not a participant therein and apparently had nothing to do with the transaction. This evidence was conceded by the government to be inadmissible and it should not have come in. However, the trial judge did immediately and lucidly instruct the jury that this evidence should not be considered by them for any purpose. In these circumstances, the failure to declare a mistrial is not reversible error. Although this testimony was not admissible, the government proved its case solidly with admissible evidence,[21] rendering the error harmless beyond a reasonable doubt, see *United States v. Bowdach,* 501 F.2d 220, 227–28 (5th Cir. 1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1331, 43 L.Ed.2d 426 (1975). Disposition of a motion for mistrial is a matter resting within the sound discretion of the trial court, and the district court did not abuse that discretion here in concluding that any prejudicial effects of this testimony could be cured by its immediate instruction, *see, e. g., United States v. Cox,* 487 F.2d 634, 636–37 and n.2 (5th Cir. 1973). The questioned testimony fits snugly under the aegis of the general rule that an error in admitting evidence can, in many circumstances, be cured by withdrawing it from the jury and giving curative instructions, *e. g., United States v. Smith,* 517 F.2d 710, 711 (5th Cir. 1975); *United States v. Troise,* 483 F.2d 615, 618 (5th Cir.), *cert. denied,* 414 U.S. 1066, 94 S.Ct. 574, 38 L.Ed.2d 471 (1973).

■ Secondly, appellants contend that the admission of the testimony about dealings in mescaline, especially that pertaining to Works' high school sister, was immaterial and highly prejudicial,[22] because, appellants assert, they were indicted for illicit *LSD* activities, not for illegal dealings in *mescaline.*[23] The government responds by contending that the evidence establishes that the transactions between the agents and Works establish a mutual intent to deal in any kind of hallucinogenic drugs; that Works' comment about his sister selling mescaline was dealer's "puffing" designed to convince his "buyers" of his

---

**20.** *See* note 7 *supra* and accompanying text.

**21.** *See* parts D and E *supra* and the text following note 24 *infra.*

**22.** *See* note 10 *supra* and accompanying text. Appellants argue that all the allegedly irrelevant testimony about other drugs was the result of the trial court's gross error in instructing the government that, "[y]ou can testify to any statement made by anyone in your presence concerning any type of narcotics," *see* note 6 *supra.* This ruling by the trial court was rather broad and is not to be recommended. Nevertheless, appellants have exaggerated its import and distorted its meaning by quoting it out of context. This statement by the judge was made in the context of his general ruling that while he would allow into evidence testimony about narcotics, he would not allow the government to bring out the fact that these conversations resulted from an investigation of Works for illicit firearms' traffic. Appellants attempt to ascribe to this statement a literalness that was specifically rejected by the trial court through his instruction on and exclusion of the marijuana testimony. *See* note 7 *supra* and accompanying text.

**23.** The government strenuously maintains that appellants did not object to the introduction of the mescaline evidence on the ground that it involved mescaline rather than LSD and that they did not, therefore, preserve this point. The government's position is not entirely unmeritorious. Appellants did not, for example, specifically object to the general ruling of the trial court discussed in note 22 *supra.*

We must, however, disagree with the government because we have concluded that appellants did adequately object to this evidence, *see, e. g.,* note 10 *supra.* Moreover, the government's brief on this point is not accurate. In note 2 of its brief, for example, the government contends that Brown objected to the September 16 testimony "on the ground of hearsay only." This is incorrect. Brown's attorney objected "to this line of testimony for the reason that it is highly prejudicial to this defendant, it was not in his presence [and] is hearsay . . . ." As we have recently stated, *Dugan v. United States,* 521 F.2d 231, 233 n.1 (1975), attorneys who appear before this court are under an obligation to present accurate briefs.

drug dealing abilities, and that appellants never specifically objected to this testimony on the ground of variance. Therefore, the government argues, this evidence was material to the conspiracy charge and its admission was not, in any event, clear error.

We find that the positions of both parties contain some merit,[24] but it is unnecessary for us to resolve this issue. The clearly admissible evidence of the September 20–21 transactions is more than sufficient to support the convictions under Count II, which charged appellants with the substantive offense of possession with intent to distribute LSD. This evidence overwhelmingly establishes that appellants possessed the seized LSD with intent to distribute it. Works was obtaining LSD and selling it to others and attempting to sell it to the agents. Brown went to get the LSD and told the agents where it was located. The dominion that both appellants exercised over the LSD establishes their actual or constructive possession of it.[25] Unquestionably then, the competent evidence relating to the September 20–21 occurrences clearly established appellants' guilt under Count II of the indictment. Thus, with respect to this count, any error in admitting evidence about other drugs was harmless beyond a reasonable

doubt, e. g., Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); United States v. Bokine, 523 F.2d 767, 773 n.2 (5th Cir. 1975) [1975] (introduction of evidence relating to marijuana harmless beyond reasonable doubt in Schedule III barbiturate prosecution where valid evidence of guilt was overwhelming).

Moreover, Brown's guilt under Count III, pursuant to which he was sentenced to a concurrent six year sentence, was clearly established by appropriate evidence. Any error in admitting the evidence as to the friend with a rifle [26] or the evidence concerning other drugs was harmless beyond a reasonable doubt in light of Brown's actions on the morning of September 21. The testimony of both the agents and Brown established that Brown aimed a pistol at them and continued to do so, accompanied by a command to put their hands up, despite a clear identification of the men as federal officers. We find unpersuasive Brown's assertion that he did not know the men were federal agents and that he merely intended to come to Works' aid by repelling intruders. Brown's only substantive defense to this count was his asserted lack of knowledge that the persons assaulted were federal agents. However, it is clear that such knowledge is

24. In applying the general evidential test of admissibility, i. e., in balancing the probative value of this evidence against its potentially highly prejudicial effect, Rule 403, Fed.R.Evi., it is doubtful that it should have been admitted. Substantively it added little to the government's case, but the potential prejudice resulting from the obvious implication (which was used in the government's closing argument) that appellants were providing mescaline to high school students is self-evident.

On the other hand, the government's assertion that the purpose of all the transactions was merely to obtain some kind of hallucinogenic drugs for the agents is persuasive. The conversations repeatedly contain references to such terms as "stuff" or "narcotics" or "drugs," see notes 11–14 supra and accompanying text, and this reflects a lack of specificity of a particular type of narcotic.

Accordingly, appellants' position on this point essentially is a variance argument: that there was a fatal variance between the crime

for which they were indicted (involving LSD) and that for which they were tried (involving mescaline). We note, however, that other circuits have rejected appellants' theory, e. g., Quicksey v. United States, 525 F.2d 337 (4th Cir. 1975), petition for cert. filed, 44 U.S. L.W. 3333–34 (Oct. 23, 1975) (indicted for transporting heroin, proof established that cocaine was the narcotic), even where the variance entails other-schedule narcotics, e. g., United States v. Ramirez, 482 F.2d 807, 816–17 (2d Cir.), cert. denied, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973) (indictment for Schedules I & II drugs, proof relates only to Schedule II narcotics). Both LSD and mescaline are Schedule I narcotics, Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 812(c)(c)(9), (11) (hallucinogenic substances).

25. See notes 14–15 and 17–18 supra and accompanying text.

26. See note 9 supra and accompanying text.

948

not required in a § 111 prosecution, *e. g.*, *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), and even a mistaken belief that the intended victim is a fleeing felon has been held not to excuse such an assault, *United States v. Hillman,* 522 F.2d 454 (7th Cir. 1975).

In view of all of the foregoing we are firm in our conclusion that admissible evidence of the guilt of both appellants under Count II is overwhelming and that the admission of the arguably tainted pre-September twentieth evidence was harmless error beyond a reasonable doubt. This conclusion applies with equal force to Brown's conviction under Count III.

█ Both appellants were convicted under Counts I and II and sentenced to concurrent two year sentences under each. Brown was sentenced to a concurrent six year sentence under Count III. In light of our conclusion that with respect to Counts II and III the admission of the complained-of testimony was harmless error beyond a reasonable doubt, appellants' convictions on at least one count are valid. Since concurrent sentences were imposed we choose to exercise our discretion and not reach the issues raised by the questioned testimony with respect to Count I, the conspiracy count. Under the concurrent sentence doctrine, this is an appropriate disposition of this case, *e. g., Barnes v. United States,* 412 U.S. 837, 848 & n.16, 93 S.Ct. 2357, 2364 & n.16, 37 L.Ed.2d 380, 387 & n.16 (1973); *Hirabayashi v. United States,* 320 U.S. 81, 105, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); *United States v. Bowdach,* 501 F.2d 220, 228 (5th Cir. 1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1331, 43 L.Ed.2d 426 (1975); *United States v. Johnson,* 496 F.2d 1131, 1133 (5th Cir. 1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1391, 43 L.Ed.2d 651 (1975).

We have carefully considered the remaining contentions of appellants as disclosed by the record, the briefs and at oral argument and we find them to be without merit. The judgments of conviction are affirmed.