**UNITED STATES of America**

v.

**Avance R. ALLEN, Appellant.**

**No. 79–1626.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1980.

Decided May 27, 1980.

David E. Schreiber, Washington, D. C. (Appointed by the Court), for appellant.

Thomas C. Hill, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh,* U. S. Atty., John A. Terry and David S. Krakoff, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge, and MARKEY,** Chief Judge of the United States Court of Customs and Patent Appeals.

Opinion for the Court filed by Chief Judge MARKEY.

Dissenting opinion filed by Senior Circuit Judge BAZELON.

MARKEY, Chief Judge:

Allen appeals his conviction, in the United States District Court for the District of Columbia, of possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a). We affirm.

## BACKGROUND

Allen was arrested at 10:55 a. m. on December 20, 1978, for drinking in a public place in the District of Columbia. The arresting officer observed Allen drinking beer from a bottle in a brown paper bag. Barnett's, the place of arrest, is a catering and carry-out service selling sandwiches and similar foods to the public. The arresting officers took Allen out of Barnett's, handcuffed him, and called for transportation to the precinct house. The officers testified that Allen "flipped" a package of cigarettes from his rear trouser pocket while they were awaiting transportation. When an officer picked the package up and told Allen

he had dropped it, Allen accused the police of trying to "plant dope" on him. The officer then opened the package and noted that it contained 28 tinfoil packets. Opening one of the packets, and finding a white powder, the officer told Allen he was under arrest for possession of narcotics. Allen said the cigarette package was not his and repeated his assertion that the police were trying to plant narcotics on him.

Before trial, Allen moved to suppress the cigarette package and its contents, *i. e.*, the heroin. The basis of the motion was that Barnett's had a liquor license; hence his drinking there was lawful, his arrest was illegal, and all evidence obtained as a result of that arrest must be suppressed. After a hearing, the trial judge ruled the evidence admissible and trial commenced.

At trial the government introduced the heroin, photographs showing Barnett's, the area, and the close proximity (175 yards) of Barnett's to a D.C. high school, and testimony concerning the arrest and the number of students who frequent Barnett's during their lunch break. The government also produced testimony that though the heroin was of a stronger concentration than is normal on the street, each packet contained a smaller total quantity of narcotics than normal. Allen was convicted by the jury of possession with intent to distribute. Imposition of sentence was suspended and Allen was placed on 2½ years probation.

## ISSUES

Allen charges that the trial court erred in (1) refusing to exclude the heroin as the fruit of an illegal arrest, and (2) admitting the proximity evidence concerning the high school and its students.

## OPINION

### (1) The Arrest

■ The touchstone in determining the legality of an arrest is whether the arresting officer, at the time of the arrest, had

* United States Attorney at the time the brief was filed.

** Sitting by designation pursuant to 28 U.S.C. § 293(a).

probable cause to believe a crime had been committed and that the arrested person had committed it. *Hill v. California*, 401 U.S. 797, 804, 91 S.Ct. 1106, 1110, 28 L.Ed.2d 484 (1971); *Menard v. Mitchell*, 430 F.2d 486, 493 (D.C. Cir. 1970); *Pendergrast v. United States*, 416 F.2d 776, 783 (D.C. Cir. 1969). The Supreme Court has defined probable cause as "facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1974) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)).

Though determination of probable cause is dependent on facts and circumstances perceived in a particular case by the officers at the time of arrest, some guidelines are present in prior decisions of the Supreme Court and of this court.

In *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), the Court held an arrest invalid for lack of probable cause in the mere knowledge of the police of what Beck looked like and of his criminal record. "Beyond that, the arresting officer who testified said no more than that someone (he did not say who) had told him something (he did not say what) about the petitioner." *Id.* at 97, 85 S.Ct. at 228.

In *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), the Court upheld the arrest of a man police mistakenly believed to be Hill. The police arrived at Hill's apartment and confronted a man who fitted Hill's description. When arrested, the man protested that he was not Hill but a friend of Hill. The Court said, "They [the officers] were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." *Id.* at 804, 91 S.Ct. at 1110.

Those two cases indicate that an arrest based on factual assumptions later found erroneous may be valid if there is adequate factual basis in the record to determine the reasonableness of the officer's conduct in making the arrest.

This court, in *United States v. Davis*, 458 F.2d 819 (D.C. Cir. 1972) held probable cause for an arrest existed in police observance of the defendant, in the presence of several people apparently under the influence of narcotics, passing money to a man and taking a small package in return. The court also considered the geographical nature of the area (high drug use) and an indication of defendant's attempt to flee. *Id.* at 822. All factors would together have indicated to a reasonable officer that a crime was being committed. *Id.* Presumably, the arrest would have been valid if the package exchanged had turned out to have been something other than drugs.

In *Pendergrast v. United States*, 416 F.2d 776 (D.C. Cir. 1969), the court found probable cause for the arrest, citing the victim's bleeding face, his identification of the defendant, and his repeated assertion that he was not mistaken. *Id.* at 784. The arrest would presumably have been valid if the defendant had turned out to have been mis-identified. As the court there stated: "[I]t would smack of hypocrisy to require police officers to be reasonable if we cannot be reasonable too." *Id.* at 785.

■ Thus probable cause must be judged "on the facts and circumstances of the particular case . . . and on the 'practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act,'" *Bailey v. United States*, 389 F.2d 305, 309 (D.C. Cir. 1967) (quoting from *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949)), that is, *on information available to the officer at the time of arrest*, not on later-acquired information.

Errors there will be. In *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), the Court, in finding probable cause, recognized that some errors

on the part of arresting officers are inevitable, but that those errors, "must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Id.* at 176, 69 S.Ct. at 1311.

This court recently restated the applicable principle: "[I]n judging the reasonableness of the actions of the arresting officer the circumstances before him are not to be dissected and viewed singly; rather they must be considered as a whole. . . . [T]hey are to be viewed through the eyes of a *reasonable and cautious police officer on the scene*, guided by his experience and training." *United States v. Young*, 598 F.2d 296, 298 (D.C.Cir.1979) (emphasis added). That the principle is not new in this court is illustrated by *Jackson v. United States*, 112 U.S.App.D.C. 260, 262, 302 F.2d 194, 196 (1962), in which the court stated: "[P]robable cause is not to be evaluated from a remote vantage point of a library, but rather from the viewpoint of a prudent and cautious police officer on the scene at the time of arrest."

█ In sum, there must be cause. Ideally, cause would be certain and positive in every case. But the legal, and practical, criterion is probable cause. The burden of proving the legality of a challenged warrantless arrest rests upon the government. *See Schnepp v. Hocker*, 429 F.2d 1096, 1099 n.5 (9th Cir. 1970). Here the government asserted that the officer made an "honest mistake." [1]

Whether the arresting officer here had probable cause to arrest Allen thus turns on the factual circumstances surrounding the arrest, that is, not on whether Allen's drinking was in fact illegal, but on whether a reasonable police officer, in light of all the circumstances before him, would have reason to believe that Allen's drinking was illegal. Barnett's, in which Allen was arrested, occupies one end of a building at 601 Division Avenue, N.E. Located at the opposite end of the same building, separated from Barnett's by a common kitchen, is the J.J. Lounge, in which beer and liquor are sold. The officer testified that "Mr. Barnett runs three separate operations there." [2]

The sole basis here for challenging the presence of probable cause, that is, for questioning whether the officer made an "honest mistake," resides in a fact in conflict with those observable at the scene of arrest. It turns out that the area encompassed by a liquor license includes the area occupied by Barnett's. [3] There is no evidence that the officer knew, or would have reason to suspect, that fact at the time of the arrest. He testified, without challenge, that he learned of the license coverage four months after the arrest.

There is evidence, and none to the contrary, that Barnett's, the scene of the arrest, looked like and was at all material times operated as a catering and carry-out service, a public place, and that Allen thus appeared to be drinking in a public place.

█ The officer testified that on the day before the arrest he observed Allen drinking beer in Barnett's and warned him that if he was seen drinking there again he

---

1. As discussed infra, government counsel later appeared to concentrate on a theory of abandonment to support admissibility of the heroin.

2. It is not clear from the record whether the J.J. Lounge had a separate entrance, or what time of day it began selling liquor. The arresting officer testified that it "*would* carry the address of 5200 Foote St., N.E." (emphasis ours) and that the owner "informed" him that persons could buy liquor if they came in "after 4 o'clock in the afternoon." For the purposes of this appeal, we need not and do not determine whether the J.J. Lounge had a separate entrance, whether it sold liquor only after 4 p. m., or whether the officer was aware of those facts (if facts they be) at the time of the arrest.

Allen does not allege that the officer learned of those "facts" only after the arrest. Nor does Allen challenge the truth of those "facts." Assuming that the officer did not know of a separate entrance and the hours of lounge operation at the time of the arrest, probable cause existed in other unchallenged facts of record that were known to and observable by him at that time.

3. The only license referred to in the record is one dated January 1979, one month *after* the challenged arrest. Defense counsel had obtained it on the day of trial. No license was formally admitted or given an exhibit number below, and none is present in the case files before us.

would be arrested for drinking in public. It is undisputed that on the next day, when he observed Allen drinking there and arrested him, the officer acted on the basis of observable facts and not on a mere "suspicion" that a crime was being committed. It is also undisputed that the officer believed he was making a valid arrest. The probable cause question turns not, however, on the subjective belief of the officer, *Hill v. California*, 401 U.S. at 804, 91 S.Ct. at 1110 (1971), but on the reasonableness of his action, *United States v. Young*, 598 F.2d at 298.

The reasonableness of the officer's conduct, as above indicated, must be considered in light of the totality of circumstances surrounding the arrest. All of the facts established on the record relating to the appearance and operation of Barnett's indicate that no one on the scene would be led to suspect that a liquor license which would be needed for operation of the J.J. Lounge might be applicable to Barnett's catering service, or would be led to inquire whether that might be the fact. The photographs of Barnett's confirm the absence of any basis for even a suspicion that it was a licensed purveyor of alcoholic beverages for consumption in the catering service. That Allen was drinking from a bottle in a brown paper bag was consistent with the observable and long-observed fact that Barnett's catering service did not sell beer. The officer testified, without challenge, that he had patrolled the area around Barnett's almost daily since 1975, that he had been inside Barnett's a number of times, and that it had been operated at all times as a carry-out and never as a bar during those four years.

■ A reasonable police officer, faced with no indication that beer was ever sold in the front portion of the premises known as Barnett's, an apparent public place, and having no knowledge of or reason to suspect that any J.J. Lounge liquor license would cover the entire premises, would ·have arrested Allen for drinking in public had he seen him drinking inside Barnett's. Those facts and circumstances warranted a prudent man's belief that Allen was committing an offense. *Gerstein v. Pugh*, 420 U.S. at 111, 95 S.Ct. at 861. Viewing the circumstances as a whole, the arresting officer acted as any reasonable and cautious police officer on the scene, guided by his experience and training, would have acted. *United States v. Young*, 598 F.2d at 298.

Allen says absence of probable cause was conceded, relying on a short exchange between the prosecutor and the trial judge.[4] That short discussion, however, is at best ambiguous. It did not touch on what was known to or observable by the officer. It could conceivably have been based on an assumption that the mere existence of the license destroyed probable cause. If so, it was based on an erroneous assumption, the officer having no knowledge of the license, ·*United States v. Young*, 598 F.2d at 298. The exchange is equally, if not more appropriately, interpretable as devoted solely to whether a court statement related to the issue of probable cause. The prosecutor having challenged the court's statement regarding Mr. Barnett's desires with "That isn't the issue," the court defended its statement by saying it had to do with the issue of probable cause, that is, *whether* there "was no probable cause." The prosecutor's "That's true" and "That is correct" is fully readable as conceding that the court's statement indeed "has to do" with probable cause.

> THE COURT: Well, it has to do with probable cause, does it not? There was no probable cause to arrest him.
> MR. KRAKOFF: That's true.
> THE COURT: He is committing no illegal act.
> MR. KRAKOFF: That is correct, Your Honor.

---

4. THE COURT: . . .

> This man wasn't causing any disturbance. Barnett didn't ask him to come in there and keep him out. At least he has not testified to that. Barnett probably didn't want him hanging around. Maybe it didn't make any difference.
> MR. KRAKOFF: That isn't the issue, Your Honor.

■ The reason for denial of the motion to suppress is unclear. It appears to have been based on an abandonment theory, but if proper for any reason it will be affirmed on appeal, *Brown v. Allen*, 344 U.S. 443, 459, 73 S.Ct. 397, 408, 97 L.Ed. 469 (1953); *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).[5] Because we find the arrest was made with probable cause, we affirm the denial of the motion to suppress.

Allen relies on *Williams v. United States*, 237 F.2d 789 (D.C. Cir. 1956), in contending that the heroin must be excluded. That reliance is misplaced. The court in *Williams* excluded narcotics abandoned at the police station because the initial arrest was "illegal because [it was] without a warrant, without probable cause, and without other validating circumstances," *Id.* at 789. Probable cause having existed here for the initial arrest, *Williams* is not controlling.

■ Probable cause having existed, there is no basis for application of the exclusionary rule. It may be useful to point out, however, that the salutary purpose and policy underlying that rule would not be served by its application here. The rule was developed to "police the police," that is, to protect the Constitutional rights of citizens by removing incentives for their viola-

tion. *Mapp v. Ohio*, 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961). The Constitutional guarantee is freedom from unreasonable arrests. Subsequently proved guilt or innocence of the accused cannot control determination of whether the initial arrest was reasonable at the time it was made. In the present case, the "tree" was not "poisoned," *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939), by police misconduct amounting to disregard or violation of Constitutional rights.[6] Assuming, for the moment, that a license covering Barnett's catering service existed at the time of the arrest, the sole flaw in police performance was a mistake of fact respecting the physical coverage of that license, a mistake to which any observer would be led by all observable conditions. Preservation of the constitutional freedom from unreasonable arrest does not require inquiry before an arrest·for a crime apparently in progress, when observable facts raise no basis for such inquiry.[7] To require police officers to know at all times the specific structures covered by all liquor licenses, including those apparently not covered and not operating as though covered, at risk of evidence exclusion and consequent frustration of reasonable efforts to enforce the law, would be to stretch the exclusionary rule to absurdity.[8]

5. The district court did not expressly "state its essential findings on the record." Rule 12(e), Federal Rules of Criminal Procedure, Allen's counsel did not request such findings, however, nor did he object to the court's failure to make such findings, nor does he now raise the absence of such findings as a ground for reversal. Thus, any objection that Allen might have had under Rule 12(e) has been waived. *See* Rule 51, Federal Rules of Criminal Procedure, *discussed in* 3 C. Wright, Federal Practice & Procedure § 842 (1969).

6. The gravity of an arrest is such that there may be circumstances imposing a duty to inquire before an arrest is made, even in the face of an apparent crime in progress and no opportunity to obtain a warrant. Nothing of record here, however, indicates that immediate action was not required at the time of the arrest, or that a fully reliable source of license coverage information was readily at hand, or that the officer acted on mere speculation. The officer knew the area and had warned Allen, but no

observable circumstances would raise a suspicion that Barnett's catering service might be licensed. That the criterion must be facts observable on the scene is illustrated by a reverse view. If unknown and unsuspected facts be the sole criterion of legality, such facts could render the unreasonableness of an officer's conduct irrelevant.

7. In *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), probable cause was found though no crime was in progress and the arrested citizen protested the mis-identification and tendered evidence of his true identity.

8. In the best of Utopian worlds there would be no need for police. In an almost-Utopian world, every neighborhood would have policemen knowledgeable of every liquor license and its geographical coverage. The world we have, if we would not make enforcement eunuchs of our police, must make room for the honest, reasonable, common sense mistake of fact in

■ Because we find that Allen's arrest was based on probable cause, we need not reach the issue of whether Allen, by throwing the cigarette package to the ground, voluntarily "abandoned" the narcotics and thereby also abandoned any protection that the fourth amendment might otherwise afford. *See Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); *Washington v. United States*, 397 F.2d 705 (D.C. Cir. 1968). Allen contends that there was not an "abandonment," but instead a "search," on the theory that the police induced him to discard the package by arresting him and holding him in custody. *See Williams v. United States*, 237 F.2d 789 (D.C. Cir. 1956). Even if Allen is correct in asserting that there was a "search" and not an "abandonment," however, the "search" would be lawful as incident to his valid arrest, and the narcotics still would be admissible in evidence. *See United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Because the evidence would in any event be admissible on a "search incident to arrest" theory, we need not decide whether it would also be admissible on a theory of "abandonment."

### (2) The Proximity Evidence

■ The evidence that the place of arrest was within 175 yards of a high school, and that students frequented that place when Allen did, tended to establish Allen's opportunity to sell his packets of heroin to the students. Hence that evidence was relevant to the intent-to-distribute element of the crime charged.

Allen argues that even if the evidence was relevant, it should have been excluded under Federal Rule of Evidence 403, because the involvement of high school students was inflammatory. Allen also says the absence of testimony that he ever sold drugs to high school students caused the proximity evidence to merely raise an "innuendo" that "he must have been present with the drugs so as to distribute to high school students."

■ The balancing of the probative value of evidence against its potential for prejudice to the defendant is within the discretion of the trial judge, whose decision will not be disturbed on appeal except for "grave abuse." *United States v. Wright*, 489 F.2d 1181, 1186 (D.C. Cir. 1973). The probative value of evidence placing one accused of intent-to-distribute among numerous potential customers is clear. The nature of the customers cannot control the admissibility of evidence that they were available. Similarly, merely because that evidence raises an inference, or in Allen's word an "innuendo," as most evidence does, forms no basis for its exclusion.

■ Allen argues that the stronger heroin concentration indicates it was not for sale to students and that this renders the proximity evidence of little probative value. That argument ignores the lower price at which the smaller quantity of narcotics in each packet could have been sold. We cannot say that the jury was not entitled to choose between the two characteristics of the heroin packets in drawing an inference therefrom.

Finding no abuse of discretion in admitting the challenged proximity evidence, we hold its admission to have been proper.

### CONCLUSION

The judgment of the District Court is affirmed.

BAZELON, Senior Circuit Judge, dissenting:

Because on this record the government has not established probable cause for appellant's initial arrest for drinking in public, I dissent.

An arrest is among the gravest intrusions of government upon the autonomy of a citizen:

making an arrest in the presence of what clearly appears to all reasonable persons to be prob-

able cause to believe a crime is being committed.

No right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.[1]

Once under arrest, an individual is deprived of his liberty. He is also subject to additional, obvious indignities such as handcuffing and body searches.[2] And, even if acquitted, an arrest record carries lingering consequences to the individual that may damage both his career and reputation.[3]

In recognition of these very real harms, the Fourth Amendment assures protection against all unreasonable arrests.[4] The stringency of this "reasonability" requirement has long been established: an arrest is not reasonable—or valid—unless the arresting officer obtains a warrant or acts upon probable cause.[5] Either route to establishing reasonableness requires grounds sufficient to convince an objective person, removed from the scene, that a citizen has committed a crime necessitating government intrusion into his protected sphere of personal privacy.[6] In assessing probable cause the Supreme Court has thus instructed reviewing courts to determine whether challenged police conduct has been "reasonable,"[7] "prudent,"[8] or "cautious."[9]

An elementary aspect of "reasonable" conduct is that before effecting an intrusion of the gravity of an arrest an officer should seek to confirm his suspicion that an arrest is, in fact, justified.[10] In some circumstances, an officer may be forced to rely upon his immediate observations in reaching this determination.[11] But where there is no need for immediate action, and potential sources for confirming or denying his suspicion are

1. *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (quoting *Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)).

2. *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

3. As this court has stated:
   Even if no direct economic loss is involved, the injury to an individual's reputation may be substantial. Economic losses themselves may be both direct and serious. Opportunities for schooling, employment, or professional licensing may be restricted or nonexistent as a consequence of the mere fact of an arrest, even if followed by acquittal or complete exoneration of the charges involved.
   *Menard v. Mitchell,* 430 F.2d 486, 490 (D.C. Cir. 1970) (footnotes omitted).

4. *The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,* and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.
   U.S.Const. amend. IV (emphasis added).

5. *See Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) (warrant); *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (probable cause known to the arresting officer). The probable cause requirement of the warrant clause is applicable to warrantless arrests as "the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest 'reasonable' under the Fourth Amendment." *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979).

6. *See Wong Sun v. United States,* 371 U.S. 471, 479–80, 83 S.Ct. 407, 413, 9 L.Ed.2d 441 (1963).

7. *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971).

8. *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959).

9. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

10. Thus, the Supreme Court has often emphasized that mere suspicion of crime cannot constitute probable cause. *See e.g., Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

11. For example, an arrest may be permissible when an individual reasonably suspected of criminal activity goes into flight upon the approach of the police. *See Sibron v. New York,* 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968).

readily at hand, the arresting officer should at least make a minimal inquiry before acting.[12] Any lesser standard would permit interference with Fourth Amendment privacy on the basis of mere speculation.[13]

In the case at hand, the critical question was whether appellant was drinking illegally. This, in turn, depended upon whether drinking was prohibited in the carry-out portion of Barnett's where the defendant was standing.[14] The arresting officer had ample opportunity to learn that drinking was legal there, and yet failed to take this obvious minimal step.[15] It is also clear from the record that there was no need for immediate action. The arresting officer testified that he saw appellant "[e]very day practically,"[16] including the day before at Barnett's,[17] and there is no evidence the officer had received a single complaint about appellant's presence or behavior there.

The majority's finding of probable cause thus rests entirely on their claim that there was no basis *"for even a suspicion"*[18] that drinking was permitted in the carry-out. This, I submit, blinks reality. Barnett's is not, as the majority would portray it, a carry-out shop tangentially related to a separately owned and operated "J.J. Lounge." The majority has not furnished, and I have been unable to find, any record support for its conclusory statements to that effect. The evidence in the record indicates that the J.J. Lounge *is part of* Barnett's, separated only by a common kitchen from the carry-out section where appellant was arrested.[19] Indeed, from this record it is un-

---

**12.** *See e.g., United States v. Barber*, 557 F.2d 628 (8th Cir. 1977) (no probable cause where officers confronted with possible illegal passage of counterfeit bill failed to take simple investigatory steps); *Lawrence v. Henderson*, 478 F.2d 705 (5th Cir. 1973) (possession by suspect fitting robber's description of uncuffed trousers still bearing store label insufficient to establish probable cause absent further investigation); *Winfield v. United States*, 430 F.Supp. 912 (S.D.N.Y. 1977) (arrest held to be without good faith belief of probable cause where no danger of flight by suspect and police failed to investigate identity or question suspect before arrest). As the court stated in *Filer v. Smith*, 96 Mich. 347, 55 N.W. 999 (1893):

> An officer is not warranted in relying upon circumstances deemed by him suspicious, when the means are at hand of either verifying or dissipating those suspicious without risk, and he neglects to avail himself of those means.

*Id.* 55 N.W. at 1002. This is no more than the familiar tort principle that nonnegligent conduct requires reasonable inquiry before risking serious harm to others. *See* W. Prosser, Law of Torts 163 (3d ed. 1964).

**13.** "The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers' whim or caprice.' *Brinegar v. United States*, 338 U.S. 160, 176 [, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879]." *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441 (1963) (footnote omitted).

**14.** Appellant was arrested for violating 25 D.C. Code § 128 (1978), which prohibits consump-

tion of alcoholic beverages in any "street, alley, park, parking, or *unlicensed public place*" and carries a maximum fine of $100 and/or 90 days imprisonment. *Id.* (emphasis added). Barnett's did not come within the terms of the statute because it maintained a Class C Retailer's license, entitling it "to keep for sale and to sell spirits, wine, and beer." 25 D.C. Code § 111(g) (1978).

**15.** The arresting officer testified he "had been walking that beat since 1975," Trial Transcript of April 27, 1979 (D.D.C. Crim. No. 79–120) (Tr.) at 19, yet never ascertained the status of Barnett's Alcohol Dispensing License. Tr. at 24.

There can be no doubt, despite certain equivocal language of the Majority, that drinking was permitted in the carry-out. Not only did appellant provide the trial court with a copy of Barnett's license (which no one claimed was in any respect different from Barnett's license at the time of the arrest), *see* Tr. at 22–23, but the government's own witness at the suppression hearing testified that Barnett's possessed such a license and that the owner had informed him that someone could walk in off the street and buy liquor at Barnett's. Tr. at 21; *see* Tr. 24–25.

**16.** Tr. at 19.

**17.** Tr. at 24.

**18.** Supra at p. 56 (emphasis added).

**19.** Mr. Barnett is the owner and operator of both the carry-out and the lounge, Tr. at 19, and his name appears in bold letters above the establishment's entryway. Gov't Exh. 2A.

clear whether there is even a separate entrance to the lounge.[20] The majority therefore states things backwards when it asks whether a reasonable police officer would have had reason to suspect that the "J.J. Lounge liquor license would cover the entire premises."[21] The question, instead, is whether the officer acted reasonably in assuming that Barnett's license was *so restricted* that it applied to only one portion of the establishment.

The officer knew that liquor was regularly sold in the lounge portion of Barnett's.[22] He also knew that the carry-out and lounge were part of a single establishment sharing a common kitchen and owned and operated by the same proprietor.[23] Further, the photographs submitted as government exhibits reveal the character of the neighborhood in which Barnett's is located: next door is a liquor store, and on the front window of Barnett's is an advertisement for a nearby "Crystal Room" featuring "Go Go Girls"

and "Mixed Drinks."[24] Barnett's, as far as these photographs reveal, is indistinguishable from these surroundings. In the face of such facts, plainly "observable on the scene,"[25] I cannot fathom how a "prudent," "cautious," and "reasonable" police officer would arrest and handcuff someone for quietly drinking beer in the carry-out without at least taking the time to ask whether drinking in that part of Barnett's was illegal. Even if this minimal inquiry would not have yielded a ready answer—which under the circumstances would seem to be incredible—it was the least that could be expected before subjecting a citizen to the indignity and serious deprivation of an arrest. The Constitution requires as much.[26]

In the absence of that minimal inquiry, there was no probable cause for appellant's arrest. Since the evidence seized in the subsequent search was inadmissible,[27] I would reverse the conviction resting on such evidence.[28]

Furthermore, in the proceedings below the word "Barnett's" was used repeatedly to describe the entire establishment. *See, e.g.,* Tr. at 20–21; 29; 32. As just one example, the following exchange took place toward the close of the suppression hearing:

> THE COURT: Is there any legal definition in the District of Columbia that the front of Barnett's is any different from the middle of it? They [the police] had no right to go in there and bother him at all, did they?
>
> [PROSECUTOR]: That is true, Your Honor, that is correct. I can't deny that.

Tr. at 32.

The majority cites the testimony of the arresting officer that "Mr. Barnett runs three separate operations there." Supra at p. 55 (quoting Tr. at 19). Apparently this is intended to show that the lounge and carry-out were distinct establishments, bearing little if any relation to each other. The fact that the officer spoke of "*three* separate operations" should suffice to rebut this contention. One of these "separate" operations was simply the "area in between [the lounge and the carry-out] for the preparation of food."

Tr. at 19.

20. Supra at p. 55 n.2.

21. Supra at p. 56.

22. Tr. at 21.

23. *See* note 19 *supra.*

24. *See* Gov't Exh. 2A.

25. *See supra* at p. 57 n.6.

26. The majority's fear that invalidating appellant's arrest would "require police officers to *know at all times* the specific structures covered by all liquor license," supra at p. 57 (emphasis added), is plainly inapposite. All that is required is the limited inquiry that simple prudence dictates *when an officer intends to make an arrest* and can confirm his suspicions with risk neither to himself or the public.

27. This is true whether the search is viewed as a search incident to an unlawful arrest, *see Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), or as a seizure of property discarded as a result of unlawful police activity, *see United States v. Beck,* 602 F.2d 726 (5th Cir. 1979); *Lawrence v. Henderson,* 478 F.2d 705 (5th Cir. 1973); *Fletcher v. Wainright,* 399 F.2d 62 (5th Cir. 1968); *Work v. United States,* 243 F.2d 660 (D.C. Cir. 1957); *Williams v. United States,* 237 F.2d 789 (D.C. Cir. 1956).

28. The government's evidence at trial consisted entirely of the Kool package, testimony about its contents, and the circumstances of its seizure from appellant, all of which derived from appellant's illegal arrest. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").

Another troubling aspect of this case is the trial court's failure to articulate its reasons for allowing the government to introduce evidence that the defendant was arrested within 175 yards of Woodson High School despite the clear danger that this evidence might be unduly prejudicial. *See* Tr. at 53. We have counseled before that effective appellate review under Rule 403 is impossible unless the trial court "confront[s] the problem explicitly, acknowledging and weighing both the prejudice and the probative worth of [proposed evidence] in the spirit of balancing stressed in the  .  .  . Federal Rules." *United States v. Robinson,* 530 F.2d 1076, 1081 (D.C. Cir. 1976). *See United States v. Slade,* 627 F.2d 293, at 304, (D.C.Cir., 1980) (abuse of discretion for trial court not "to attempt to strike any balance between the relevance and potential prejudice of the evidence."). *See also United States v. Sangrey,* 586 F.2d 1312, 1315 (9th Cir. 1978) (trial court should give clear statement of process of balancing probativeness and prejudice); *John McShain, Inc. v. Cessna Aircraft Co.,* 563 F.2d 632, 635 (3d Cir. 1977) (same); *United States v. Dwyer,* 539 F.2d 924, 928 (2d Cir. 1976) (same); [1979] 1 Weinstein's Evidence ' 403[02] at 403 - 14 to 403 -15 (same).

Here, where appellant was prosecuted for intent to distribute dangerous narcotics, the government's reference to Woodson High School and its students was obviously highly inflammatory. *See United States v. Works,* 526 F.2d 940, 946 (5th Cir. 1976) (reference in similar prosecution to "two high school-looking kids" held inadmissible); *United States v. Parkison,* 417 F.Supp. 730, 734 (E.D.Wis.1976) (government barred in similar prosecution from referring to junior high school across the street from defendant's residence because "the relevance was greatly outweighed by the possibility of prejudice to the defendant"). And the proposed use of this evidence here called for especially sensitive balancing under Rule 403, because the evidence's relevance was predicated entirely on the intervening assumption that the high quality heroin found in the cigarette pack would be diluted by adolescent purchasers—an assumption that was never directly supported by government witnesses. *Cf. United States v. James,* 555 F.2d 992, 1000 n.47 (D.C. Cir. 1977) (danger of prejudice rendered evidence inadmissible where inference necessary for relevance attenuated by need for intervening premises).

As an appellate tribunal, to be sure, we are bound to accept the trial court's balance under Rule 403 absent an abuse of discretion. *United States v. Williams,* 561 F.2d 259, 861 (D.C. Cir. 1977). *See* supra at p. 58. But, "discretion does not mean immunity from accountability." *United States v. Dwyer, supra,* 539 F.2d at 928. By failing to explain how it reconciled the danger of prejudice associated with the evidence about the high school with the probative value of that evidence, the trial court has made any review of its exercise of discretion highly speculative.